2011 Ark. App. 419

**Honor RENFRO, Appellant**

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES,**
Appellee.

**No. CA 10–1224.**

Court of Appeals of Arkansas.

June 1, 2011.

Thomas Wilson, Russellville, for appellant.

Melissa Bristow Richardson, Jonesboro and Misty Bowen Eubanks, Little Rock, for appellee.

DOUG MARTIN, Judge.

Appellant Honor Renfro challenges the decision of the Benton County Circuit Court terminating her parental rights to her three children, C.R.1, C.R.2, and C.H. On appeal, she argues 1) that there was insufficient evidence of an appropriate permanency placement plan for the children and 2) that the circuit court abused its discretion in failing to grant her a continuance. We find no error in the trial court's decision and affirm.

Renfro's three children were taken into emergency custody by the Arkansas Department of Human Services (DHS) on December 5, 2008, after Renfro was arrested for public intoxication when she showed up at school to get one of her children but was too impaired to stand up. The court entered an order for emergency custody on December 8, 2008, and set a probable-cause hearing for December 15, 2008. The court held an adjudication hearing on February 17, 2009, and entered an adjudication order finding that the children were dependent-neglected.

In the adjudication order, the court noted that Renfro stipulated that she failed to provide the children with necessary food, clothing, shelter, education, and medical treatment; lacked stable employment to provide for the children's basic needs; and lacked safe, stable, and appropriate housing. The court found that returning the children to their parents was contrary to their welfare and thus continued custody

with DHS, while setting a goal of reunification with the mother.

A May 26, 2009 review order established that the goal continued to be reunification, but the court set a concurrent plan of "permanency for the juveniles through alternative goals, other than reunification." At that time, the court noted that Renfro remained unstable and lacked stable housing, employment, and transportation.

On March 18, 2010, DHS filed a petition for termination of Renfro's parental rights. The petition alleged that the children had been adjudicated dependent-neglected, had continued out of Renfro's custody for more than twelve months, and, despite DHS's efforts to rehabilitate Renfro, she had not corrected the conditions that caused the children to be removed. In a permanency-planning order entered on June 8, 2010, the court changed the goal of the case from reunification to adoption and directed DHS to develop an appropriate permanency case plan.

The court held a hearing on the termination petition on June 8–9, 2010. During that hearing, counsel for DHS asserted to the court that there were two foster families who had expressed interest in adopting the children; one of the families had fostered the children for "quite a while." At the conclusion of the hearing, however, the court expressed concern that it was not "abundantly clear that there is a viable option for going forward with adoption of these boys." Accordingly, the court withheld its ruling on terminating Renfro's parental rights pending further investigation into potential adoptive homes. The court then held a subsequent hearing on July 27, 2010, at which time DHS introduced, without objection, an Arkansas State Police report to the prosecuting attorney concluding that previous claims of abuse against the foster parents, Steve

and Erika Grimes, were unsubstantiated.[1] In that report, Erika Grimes indicated to the interviewer that she was concerned about previous allegations of abuse due to the fact that she and her husband had talked about adopting the children, and Steve Grimes specifically related that the children did well in their home and that he and his wife would like to adopt the children.[2]

Upon receiving that report, the circuit court granted the termination petition and changed the goal to adoption. The court noted that, in addition to the Grimeses, relatives of Renfro had approached DHS seeking placement of the children with them. The court directed all parties interested in adopting the children to hire counsel and make the appropriate pleadings before the court, but it indicated that it intended to "mov[e] forward with adoption of the boys by [their] foster parents."

The court subsequently entered an order on September 1, 2010, terminating Renfro's parental rights and authorizing DHS to consent to the adoption of the children. Renfro filed a timely notice of appeal on September 22, 2010. As noted above, she raises two arguments on appeal: the court erred in terminating her parental rights when there was no testimony pertaining to the adoption of the children; and the court abused its discretion in failing to grant Renfro a continuance to obtain the consent of her father and stepmother to adopt the children.

A heavy burden is placed upon a party seeking to terminate the parental relationship, and the facts warranting termination must be proven by clear and convincing evidence. *Friend v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 606, 344 S.W.3d 670; *Strickland v. Ark. Dep't of Human Servs.*, 103 Ark.App. 193, 287 S.W.3d 633 (2008). The question this court must answer is whether the trial court clearly erred in finding that there was clear and convincing evidence of facts warranting the termination of parental rights. *Hall v. Ark. Dep't of Human Servs.*, 101 Ark.App. 417, 278 S.W.3d 609 (2008). Termination of parental rights is an extreme remedy and in derogation of the natural rights of parents, but parental rights will not be enforced to the detriment or destruction of the health and well being of the child. *Dowdy v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 180, 314 S.W.3d 722. Pursuant to Arkansas Code Annotated section 9–27–341(b)(3)(A) (Repl. 2008), an order terminating parental rights must be based on a finding that termination is in the child's best interest, which includes consideration of the likelihood that the juvenile will be adopted and the potential harm caused by returning custody of the child to the parents. In addition, the proof must establish at least one of several statutory grounds. Ark.Code Ann. § 9–27–341(b)(3)(B). This court gives a high degree of deference to the trial court, as it is in a far superior position to observe

1. Although the dissent claims that C.H. complained of physical abuse at Erika Grimes's hand "on more than one occasion," the state police report indicates that C.H. informed the police interviewer that he had never been spanked in the Grimeses' home and "appeared to be a bit surprised" by a question about being kicked by anyone in the house.

2. The dissent complains that this statement was "unsworn double hearsay," but the statement was nonetheless introduced without objection by any party. Where no specific hearsay objection is raised to a piece of evidence, any argument concerning the introduction of that evidence is waived. *See Donahue v. Ark. Dep't of Health & Human Servs.*, 99 Ark.App. 330, 260 S.W.3d 334 (2007). Moreover, hearsay evidence, admitted without objection, may support a verdict. *Ark. State Highway Comm'n v. Bradford*, 252 Ark. 1037, 482 S.W.2d 107 (1972).

the parties before it and judge the credibility of the witnesses. *Dowdy, supra.*

■ In Renfro's first argument, she assigns error to the lack of testimony pertaining to the adoptability of the children. Because there was no testimony on the issue, she argues, the trial court had no evidence to consider in determining that adoption was in the best interest of the children.

An order terminating a parent's rights must be based upon a finding by clear and convincing evidence

(A) That it is in the best interest of the juvenile, including consideration of the following factors:

(i) The likelihood that the juvenile will be adopted if the termination petition is granted; and

(ii) The potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent . . .; and

(B) Of one (1) or more of the following grounds:

(i)(a) That a juvenile has been adjudicated by the court to be dependent-neglected and has continued to be out of the custody of the parent for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent.

Ark.Code Ann. § 9–27–341(b)(3) (Repl. 2008).

Thus, according to this statute, termination of parental rights must be based on a finding by clear and convincing evidence that it is in the best interest of the child, including consideration of such factors as the likelihood of adoption. However, this court has held that adoptability is *but one factor* that is considered when making a best-interest determination. *McFarland v. Ark. Dep't of Human Servs.,* 91 Ark. App. 323, 210 S.W.3d 143 (2005) (emphasis added). Moreover, we have held that there is *no requirement that every factor must be established by clear and convincing evidence;* rather, after consideration of all the factors, the evidence must be clear and convincing that the termination is in the best interest of the children. *Id.* (emphasis added); *see also Reed v. Ark. Dep't of Human Servs.,* 2010 Ark. App. 416, 375 S.W.3d 709.

Quite recently, in *Dority v. Arkansas Department of Human Services,* 2011 Ark. App. 295, 2011 WL 1495988, this court rejected the appellant's "mischaracteriz[ation of] the trial court's statutory obligation regarding adoptability in its best-interest analysis," stating that the trial court "must *simply consider the likelihood that the children will be adopted—that factor need not, however, be established by clear and convincing evidence.*" *Dority,* 2011 Ark. App. 295, at 6, 2011 WL 1495988 (emphasis added); *see also Reid v. Ark. Dep't of Human Servs.,* 2011 Ark. 187, 380 S.W.3d 918 (holding that there is no requirement that the factors in section 9–27–341(b)(3)(A)(i)–(ii) be established by clear and convincing evidence; rather, after consideration of all the factors, the evidence must be clear and convincing that the termination is in the best interest of the child); *Clingenpeel v. Ark. Dep't of Human Servs.,* 2011 Ark. App. 84, 381 S.W.3d 107.

Renfro argues that the only "evidence" regarding adoptability was a statement from counsel for DHS, who said that DHS had two foster families that had expressed interest in adopting the children. At the termination hearing, the DHS attorney also pointed out that the department had considered placing the children with their stepgrandparents, although it had not pre-

sented evidence at that hearing regarding a home study that was done of the step-grandparents' home. Renfro's attorney interposed that one of the foster homes—that of the Grimeses—was being investigated due to an allegation of abuse. The attorney ad litem asked whether the court would consider holding its ruling in abeyance until "something could be worked out" with either the foster home or the grandparents. After the court gave its impression of the children's situation, the court stated that it was "inclined to withhold my ruling in this case [and] give everyone an opportunity to sort through the information, and see if we can come back here in approximately forty-five days and be more clear as to what's going to happen going forward in this case." The court did not render a ruling regarding termination of Renfro's parental rights at that time.

At the subsequent hearing on July 27, 2010, the attorney for DHS introduced, without objection, a state police report regarding the allegations of abuse against Erika|₈Grimes. The report found the allegations of abuse to be unsubstantiated and recommended closing the case; further, the report contained interviews with the children and with both Erika and Steve Grimes. The children reported that they felt safe in the Grimeses' home and liked the placement. The interview with Erika indicated that she was concerned about the

allegations because she and her husband had talked about adopting the children.

The court specifically based its ruling on this report, stating that "[b]ased on the information that the investigation into the proposed adoptive home—[the] foster home where these boys have—where two of these boys have been, I'm going to go ahead and grant the TPR and change the goal to adoption." Moments later, the court stated,

What has happened is, I withheld my ruling as to termination of parental rights until the Department had established a clear path to adoption for these boys. Today, they have provided me with an exhibit that exonerates some people who are interested in adoption, from a claim that was made. It opens the way for them to adopt all three of these boys.

The trial court thus considered evidence of the likelihood that the children would be adopted before it ruled that termination would be in the children's best interest.[3] As |₉previously stated, our appellate courts have noted that, in considering the best interest of the child, there is no requirement that every factor considered be established by clear and convincing evidence; rather, after consideration of all factors, the evidence must be clear and convincing that termination is in the best interest of the child. *Reid v. Ark. Dep't of Human Servs.*, 2011 Ark. 187, 380 S.W.3d 918; *McFarland, supra.*

3. We hasten to point out, however, that DHS should not consider our opinion as sanctioning the offering of such scant evidence or holding that the "bare minimum" will suffice in every case. While the circuit court need only consider the likelihood that the juveniles will be adopted in the event the termination petition is granted, it is obviously preferable that DHS should present all available evidence—whether testimonial, documentary, or both—to the circuit court in order that the court may make the best-informed decision possible regarding the termination of a parent's rights in his or her children. Quite clearly, statements and arguments of counsel are not evidence, *see Johnston v. State*, 2010 Ark. App. 626, 2010 WL 3700214, and we will not accept mere representations by DHS's attorneys to be sufficient. In this case, however, the termination order was entered by an experienced judge who had presided over this case since its inception and who clearly considered evidence of the "likelihood that the juvenile[s] [would] be adopted."

We are mindful of the cases of *Haynes v. Arkansas Department of Human Services*, 2010 Ark. App. 28, 2010 WL 135194, and *Grant v. Arkansas Department of Human Services*, 2010 Ark. App. 636, 378 S.W.3d 227. We find both cases distinguishable from the present case, however. In *Haynes, supra*, this court reversed an order terminating the father's parental rights. There, however, this court pointed out that, while the trial court's order made findings regarding the "other grounds" listed in Ark.Code Ann. § 9–27–341(b)(3)(B), it simply stated that it was not in the children's best interest to return them to their father and directed DHS to "develop a case plan with the goal of adoption." This court held that the record demonstrated *"no consideration* by the court of adoptability as part of its best-interest analysis. Indeed, *no evidence of adoptability* of the children was introduced at the hearing." *Haynes*, 2010 Ark. App. 28, at 4, 2010 WL 135194 (emphasis added). Here, by way of contrast, the trial court specifically considered evidence regarding the foster family that wanted to adopt the children, and the court's order specifically stated that DHS was "deemed to have an appropriate placement plan for the juveniles, specifically, the permanent plan is adoption." Clearly, *Haynes* is distinguishable from the present case.

Moreover, in *Grant, supra*, the "evidence" of adoptability was a DHS case worker's statement that she believed "all children are adoptable." *Grant*, 2010 Ark. App. 636, at 9, 378 S.W.3d 227. There was no evidence indicating that any specific adoptive home was available or was being considered. Given the "dearth of evidence of adoptability," this court reversed the circuit court's decision to terminate the mother's parental rights. *Id.* at 13–14, 378 S.W.3d 227. In the instant case, by way of contrast, the circuit court was presented with evidence containing direct statements from the potential adoptive parents that they wanted to adopt the children. As neither the statute nor our case law requires any specific quantum of evidence, we conclude that the court properly applied the law, gave appropriate consideration to the adoptability of the children, and did not clearly err in finding that there was clear and convincing evidence of facts warranting the termination of parental rights.[4]

In a second argument on appeal, Renfro argues that the circuit court abused its discretion in failing to grant her a continuance in order for Renfro to give her consent for her father and stepmother to adopt the children and to allow DHS to complete an adoptive home study on her father and stepmother. Renfro notes that Ark.Code Ann. § 9–27–341(d) allows the trial court the discretion to continue a termination hearing for good cause, and she cites *Rhine v. Arkansas Department of Human Services*, 101 Ark.App. 370, 278 S.W.3d 118 (2008), as holding that "providing permanency and keep[ing] the siblings together in the present case is good cause for continuance." Renfro has not demonstrated on appeal that the circuit court abused its discretion in denying her request for a continuance.

At the beginning of the June 8, 2010 termination hearing, the following colloquy

4. Renfro raises no serious argument that termination of her parental rights was not in the children's best interest. As such, the dissent's discussion of why the termination of Renfro's parental rights was or was not in the children's best interest is of no moment. Moreover, the dissent's comments regarding how much Arkansas taxpayers would "probably" be out in the event this termination is upheld is completely speculative, unsupported by the record, and irrelevant for purposes of our review.

occurred between Renfro's attorney and the court:

COUNSEL: Your Honor, I would like to put a motion before the court to continue this case. I have spoken with my client on Monday, and we also spoke this afternoon. And she has indicated to me that she would sign a consent for her step-mom and her dad to adopt these children. And I would ask for a continuance to allow her to execute a consent for the Department to check into these people and see if they're appropriate.

COURT: Well, as we discussed in chambers before this case was called, such a consent is not the same thing as a voluntary relinquishment of parental rights, and would invoke a number of procedures that would have to be followed that would in turn cause this case to go on another six months or more. And so I'm not inclined to do that. I had hoped that your client might be willing to voluntarily relinquish. And, of course, we would consider her parents as potential adoptive parents, along with anyone else who may be seeking adoption. But if we can't do that, then I'm inclined to move forward starting today. So, I'm going to deny your motion for continuance on that basis, ma'am.

COUNSEL: Thank you, Your Honor.

Shortly thereafter, the court inquired as to whether counsel was familiar with and relying upon *Rhine, supra.* The court then called a brief recess, and counsel was given a moment to study the case. At the end of the recess, the court made the following statements from the bench:

This is a termination of parental rights hearing for the mother, Honor Renfro.... It has been brought to my attention that there was a case out of Washington County in which the court of appeals reversed a trial court because it did not grant a continuance where the mother asked for a continuance, so that she could consent to her parents' adopting of the children. The circumstances of that case are, in this court's opinion, considerably different than the circumstances in this case.

In that case, the circuit court was dealing with—was being pressed by the notion that the 90 days from the date that the termination petition is filed, until the termination hearing is held, was running. While that is in fact so in that case, that is not my consideration in denying the motion for continuance. The reason I am denying the motion for continuance here is because this case is 18 months old. These children have been in their placements for some time. There is a permanency that needs to be established for them. The fact that the mother's parental rights may be terminated does not prevent her parents from filing a petition asking to adopt the children. So, I don't see that this case is anywhere near on all fours with that case. So I'm going to continue to deny the motion for continuance.

Arkansas law is well settled that the granting or denial of a motion for continuance is within the sound discretion of the trial court, and that court's decision will not be reversed absent an abuse of discretion amounting to a denial of justice. *Smith v. Ark. Dep't of Human Servs.*, 93 Ark.App. 395, 219 S.W.3d 705 (2005) (citing *Green v. State*, 354 Ark. 210, 118 S.W.3d 563 (2003)). Additionally, the appellant must show prejudice from the denial of a motion for continuance. *Id.* In her brief, Renfro offers no discussion or analysis of why the circuit court's denial of her motion for continuance constituted an abuse of discretion or caused her prejudice; rather, she simply states that "by denying the

motion, the trial court abused its discretion." As the appellate courts will not develop a party's arguments for him or her, *see Teris, LLC v. Chandler,* 375 Ark. 70, 289 S.W.3d 63 (2008), we conclude that Renfro's second issue presents no basis for reversal.

Affirmed.

WYNNE, GRUBER, ABRAMSON, and BROWN, JJ., agree.

HART, J., dissents.

JOSEPHINE LINKER HART, Judge, dissenting.

Few rights are held more dearly than the right to parent our children. Yet, after today's opinion, few rights are afforded weaker due-process protection. In achieving this remarkable result, I submit that the majority has made grievous errors of fact and law.

Although the dependency-neglect adjudication of the children was not an issue in this case—Ms. Renfro stipulated to it— the majority has elected to justify its action by making Ms. Renfro out to be a derelict by reciting that she was "too *impaired* to stand up." The inconvenient truth is that at the time of her arrest, Ms. Renfro was tested and no traces of illegal drugs of any kind were found and no evidence of alcohol was noted. Furthermore, the trial judge found that Ms. Renfro's public intoxication was attributed to an "unknown substance believed to be prescription drugs."

The truth is, Ms. Renfro is a woman with some medical problems—the record indicates that she was taking several prescription drugs, for among other maladies, a seizure disorder—and she had some problems completing the case plan. Steady employment was elusive for her, as was stable housing. In her twenty-seven years, she had shown a pattern of being dependent on the men in her life. The record also indicates that she loved her children, and, even more importantly, they were strongly bonded to her. It is worth noting that there are *three* children directly involved in this case, and a fourth sibling that is also affected. C.R.1, born April 27, 1998, and C.H., born April 24, 2003, have been placed with Erika and Steven Grimes, while C.R.2, born January 18, 2000, is placed with another "provider." A fourth child, S.R., born February 22, 2001, who is not listed in the termination order on appeal, is nonetheless profoundly affected by it in that the courts have mandated a scattering of S.R.'s sibling group.

The foster-care experience for C.R.1, C.R.2, and C.H., has not been a completely happy one. Placement with the Grimeses was the third stop for C.R.1 and C.H. Prior to being placed with the Grimeses, C.R.1 complained that he was not being fed by the "experienced provider." While with the Grimeses, according to Erika, C.H. complained on more than one occasion that he was being physically abused by Erika Grimes, but was not believed.

I am troubled by the lack of evidence of adoptability in this case, but even more by the majority acknowledging that the trial court's reluctance to find that the children were adoptable was overcome not by evidence but by the assurances of ADHS's trial counsel that "there were two foster families who had expressed interest in adopting the children." The majority fails to note that the ADHS attorney also noted that "one of them has expressed more interest than the other, because of housing arrangements." According to ADHS's trial counsel, the home being considered as the "primary choice" was the Grimeses', and Erika Grimes was under investigation by the Arkansas State Police for allegedly abusing C.H. The ADHS trial counsel persuaded the trial court to delay the ter-

mination of Ms. Renfro's parental rights not only to allow the Grimes investigation to be completed, but also to "sort out the grandparents and then talk to the other foster family." The other supposedly interested foster home was never identified.

When the proceedings were resumed, ADHS submitted a report from the Arkansas State Police indicating that the complaint against Erika Grimes was unfounded. While the majority asserts that, in the formal report of the State Police's child abuse investigation, Erika Grimes expressed interest in adopting "the children," the children that she was speaking of were not specifically identified—she had three foster children in her home, one of which was not related to Ms. Renfro. Moreover, this statement, upon which the majority relies so heavily did not even appear in the summary of the State Police's interview with Erika Grimes. It appeared in a section that was captioned "Worker's observation." I note, Steve Grimes, a long-haul truck driver, who was seldom at home—his interview was delayed because he was gone on a six-day "haul"—stated that "the children seem to do fine in their home and they would like to adopt them if possible." Obviously, both "statements" are unsworn double hearsay, offered in an attempt to fend off an allegation of child abuse. I acknowledge that the admission of the State Police report was not objected to.[1] However, even if we are to give the report its highest possible probative value, it is totally inadequate to answer the question regarding the adoptability of C.R.2, because he was never considered. Although ADHS's trial counsel promised to "sort out the grandparents and then

talk to the other foster family," he never did. Accordingly, there was *no evidence*, not even lawyer talk or police reports, presented regarding whether C.R.2 was adoptable and apparently not even any consideration. I cannot excuse this oversight. I believe every child is important.

As troubling as the majority's handling of the facts is, it pales in comparison to the majority's mistakes of law. I am gratified that the majority has reaffirmed the holdings in *Haynes v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 28, 2010 WL 135194, and *Grant v. Arkansas Department of Human Services*, 2010 Ark. App. 636, 378 S.W.3d 227, where the court of appeals has clearly stated that "consideration" of the adoptability of the children must be based on "evidence." I lament that the applicability of these worthy authorities has somehow eluded the majority. Its attempt to distinguish *Grant* clearly misses the mark. In *Grant*, there was a scintilla of evidence regarding adoptability; ADHS worker Glenda Shavers opined, that "all children are adoptable." I submit that a statement made to a child-abuse investigator where the immediate concern was the resolution of child-abuse allegations, not whether the parties honestly desired to adopt some of Renfro's children is less than a scintilla of evidence.

Moreover, the majority's reliance on the Grimeses' statements is mere sophistry. The trial judge did not delay the termination of Ms. Renfro's parental rights in hope that the Grimeses had somehow expressed a desire to adopt the children as they fended off child-abuse allegations. It is obvious from the record that the trial

---

1. The majority's citation of *Donahue v. Arkansas Department of Health and Human Services*, 99 Ark.App. 330, 260 S.W.3d 334 (2007), betrays its understanding of my point regarding the information contained in the report. *Donahue* stands for the unremarka- ble proposition that appeals of evidentiary rulings must be preserved by a specific contemporaneous objection. Whether or not the statements in question were objected to does not make them something that they are not.

judge based his decision on the assurances of the ADHS trial counsel that there are "families" interested in adopting Renfro's children. The State Police report was offered to prove that the child-abuse allegations against Erika Grimes was unfounded, and it was admitted into evidence without the trial court having scanned it for the statements discussed above. We know this fact because the trial judge himself said so:

> What happened is, I withheld my ruling as to termination of parental rights until the Department had established a clear path to adoption for these boys. Today they have provided me with an exhibit that exonerates some people who are interested in adoption from a claim that was made. It opens the way for them to adopt all three of these boys.

At all times, the trial judge based his consideration of adoptability on assurances from trial counsel. Again, the trial judge admitted as much when he announced from the bench, "They are also informing me that family members, I think maybe an aunt, or a sister of the mother, has approached the Department seeking placement of the children and maybe someone else. I'm not sure who." If these alleged facts were presented in the form of "evidence," perhaps the trial judge would be "sure" who was interested.

It is so well settled as to be axiomatic that statements by counsel are not evidence. *Barnes v. State*, 346 Ark. 91, 55 S.W.3d 271 (2001); *Montgomery v. Butler*, 309 Ark. 491, 834 S.W.2d 148 (1992); *Roberts v. Green Bay Packaging, Inc.*, 101 Ark.App. 160, 272 S.W.3d 125 (2008). Indeed, even the majority has acknowledged that statements of counsel are not evidence. Nonetheless, the majority somehow finds that these statements of counsel should be morphed into being evidence, presumably because the decision was made by "an experienced judge." Our appellate review should be uniform. We should never alter our standards to fit our perception of a trial judge's experience or ability.

The majority's admonition to ADHS to "not consider [its] opinion as sanctioning the offering of such scant evidence" rings hollow. The record indicates that ADHS's trial counsel told the trial judge that Erika Grimes was present in the courtroom and could easily have been called to testify as to her intentions regarding adopting some of Ms. Renfro's children. Likewise, at the conclusion of the resumed hearing, the trial judge announced that anyone else interested in adopting the "boys" should hire a lawyer and pursue that option. Presumably, if there was any bona fide interest in adopting the minor children, that interest could have been established through testimony, then and there.

I am mindful that, for example, the supreme court in *Reid v. Arkansas Department of Human Services*, 2011 Ark. 187, 380 S.W.3d 918, and this court in *McFarland v. Arkansas Department of Human Services*, 91 Ark.App. 323, 210 S.W.3d 143 (2005), have said that proof of adoptability need not be proven by clear and convincing evidence. However, while these worthy authorities excuse ADHS from providing clear and convincing evidence regarding adoptability, they merely beg the question as to what standard of proof is required. As I noted previously, in *Haynes* and *Grant*, which the majority does not suggest they are overruling, the court of appeals stated unequivocally that a trial judge could not "consider" adoptability without evidence.

It is my understanding that in American jurisprudence, there are three levels of evidence required: beyond a reasonable doubt, clear and convincing, and a preponderance in most civil cases. The case at

bar represents a squandered opportunity to define the quantum of proof necessary for a trial judge to "consider" the adoptability of the children in question. That is, were the majority not so eager to throw the proverbial baby out with the procedural bath water. *Sartin v. State*, 2010 Ark. 16, 362 S.W.3d 877. However, even if the majority adopted an "any evidence" standard, even that abysmally low showing would not have been met in this case because there was no evidence concerning C.R.2's adoptability whatsoever. The fact that the majority has failed to acknowledge that there is no evidence concerning C.R.2's adoptability is tacit admission that their position is manifestly unsound.

Finally, I cannot understand why the majority seems to think that the termination of Ms. Renfro's parental rights to her children is in the children's best interest—or anybody else's.[2] Again, the record reveals that the children were strongly bonded to Ms. Renfro and the trial judge correctly noted that the children were at an age where they were certain to remember their devoted mother. There is no evidence to suggest that it is in the children's best interest to deny them access to a loving mother, who has not physically harmed them in any way. Moreover, the holy grail of "permanency" is likely to be elusive in this case. The purported best alternative, the current foster-home placements for these children is their third stop, and we do not know if C.R.2's foster family is even interested in adoption. Regarding the foster parents who, according to ADHS's trial counsel and the State Police child-abuse investigators, may be interested, the "family" consists of a mother whose job is providing foster care and a father who is a long-haul truck driver who claimed he was on the road for six days at a time.

It is impossible to predict how successful adoptive parents will be, if indeed a full compliment of adoptive parents can be found. However, we need not look any further than Ms. Renfro herself to realize that adoption is not a panacea. Ms. Renfro herself was separated from her mother at age eight and adopted by a stepmother. Ms. Renfro married at age fourteen and shortly thereafter gave birth to the first of her four children. Significantly, Ms. Renfro's adoptive mother has been identified as a potential "permanent placement" for one or more of the children. Interestingly, Ms. Renfro reunited with her birth mother when she turned nineteen.

I am compelled to note that in "freeing up" the children for adoption, two fathers[3] and a mother have been excused from not only rearing the children, but also supporting the children that they brought into this world. As a sibling group and as older children, the adoption—if it actually takes place—will be eligible for a subsidy that will cost the taxpayers almost $1400 per month, plus the cost of medicaid. 016–15–011 Ark.Code R. VIII—I (Weil 2011). That means that the taxpayers will probably be out well over $200,000 by the time

---

2. The majority's suggestion that "Renfro raises no serious argument that termination of her parental rights was not in the children's best interest," betrays its shallow understanding of the requirements of Arkansas Code Annotated section 9–27–341. The statute requires that termination of parental rights shall be based on a finding by clear and convincing evidence that it is in the best interest of the child, including consideration of factors such as "the likelihood of adoption of the child." *McFarland v. Arkansas Dep't of Human Servs.*, 91 Ark.App. at 327, 210 S.W.3d at 147. The adoptability of the child is an integral part of the best-interest-of-the-child analysis.

3. Apparently, the parental rights of both fathers were terminated when neither showed up at the hearing.

the children reach their majority. Ironically, $1400 per month is likely more than the take-home pay Ms. Renfro and many other working mothers could expect to earn.

It is apparent that as termination-of-parental-rights jurisprudence continues to evolve, we are straying farther and farther from the stated intent of our juvenile code. In Arkansas Code Annotated section 9–27–302, the legislature stated that the purpose was in pertinent part:

> (1) To assure that all juveniles brought to the attention of the courts receive the guidance, care, and control, *preferably in each juvenile's own home* when the juvenile's health and safety are not at risk, that will best serve the emotional, mental, and physical welfare of the juvenile *and the best interest of the state;*
>
> (2)(A) *To preserve and strengthen the juvenile's family ties* when it is in the best interest of the juvenile;
>
> . . .
>
> (D) To assure, in all cases in which a juvenile must be permanently removed from the custody of his or her parents, that the juvenile be placed in an approved family home and be made a member of the family by adoption.

(Emphasis added.)

Here, the Arkansas Department of Human Services, which supposedly entered the lives of Ms. Renfro and her children under a program charged with helping the family has utterly failed. As the trial judge correctly noted, we are dealing with older children who will carry the memory of their mother and some sense of responsibility for their family being shredded. The final living arrangement for at least one child, if not all, is far from certain. At the same time, the taxpayers have been burdened with the cost of raising those children while the natural parents are relieved of that obligation. I cannot agree that this is in anybody's best interest.