Cite as 2021 Ark. App. 335

# ARKANSAS COURT OF APPEALS

DIVISION II

**No.** CV-21-30

| | |
|---|---|
| EVA BREWER AND JONATHAN BREWER | **Opinion Delivered** September 15, 2021 |
| APPELLANTS | |
| V. | APPEAL FROM THE SCOTT COUNTY CIRCUIT COURT [NO. 64JV-19-52] |
| | HONORABLE TERRY SULLIVAN, JUDGE |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN | |
| APPELLEES | AFFIRMED |

## KENNETH S. HIXSON, Judge

Appellants Eva Brewer and Jonathan Brewer appeal separately from an order terminating their parental rights to their daughter V.B. (DOB 3-16-2015), daughter O.B. (DOB 8-26-2016), and son E.B. (DOB 9-1-2019). In Eva's appeal, she argues that there was insufficient evidence that termination was in the children's best interest. Eva specifically claims that there was no proof that the children could achieve permanency through adoption; that she does not pose a risk of harm to the children; and that there was no consideration given to the effect that termination would have on the sibling relationship. In Jonathan's appeal, he argues that there was insufficient evidence that termination was in the children's best interest because he did not pose a risk of harm to the children. Jonathan also contends that appellee Arkansas Department of Human Services (DHS) did not make

reasonable efforts to provide him services. We affirm the trial court's order as to both Eva's appeal and Jonathan's appeal.

## I. *Standard of Review*

In order to terminate parental rights, the trial court must find by clear and convincing evidence that termination is in the best interest of the juvenile, taking into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted; and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii) (Supp. 2021). The order terminating parental rights must also be based on a showing by clear and convincing evidence as to one or more of the grounds for termination listed in section 9-27-341(b)(3)(B). However, only one ground must be proved to support termination. *Best v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 485, 611 S.W.3d 690.

A trial court's order terminating parental rights must be based upon findings proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341(b)(3). Clear and convincing evidence is defined as that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Posey v. Ark. Dep't of Health & Hum. Servs.*, 370 Ark. 500, 262 S.W.3d 159 (2007). On appeal, the appellate court reviews termination–of–parental–rights cases de novo but will not reverse the trial court's ruling unless its findings are clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In determining whether a

2

finding is clearly erroneous, an appellate court gives due deference to the opportunity of the trial court to judge the credibility of witnesses. *Id.*

## II. *Relevant Facts*

This case began on October 15, 2019, when DHS filed a petition for emergency custody of V.B. and O.B. When the petition was filed, V.B. and O.B. were in Jonathan's care, and V.B. disclosed that Jonathan had hit her in the face with his fist and grabbed the back of her neck. V.B. had a black eye, a scratch on her cheek, and a faint bruise that appeared to be in the shape of a thumb near the back of her neck. The house was dirty and cluttered. Jonathan refused to speak with DHS or take a drug screen. At this time, Eva was staying in the hospital with the parties' son, E.B., who had been born prematurely with complications six weeks earlier. The affidavit of the caseworker noted that DHS had a previous history with Jonathan that included a true finding of striking an unrelated child's face with his fist several years ago. It was also noted in the affidavit that Eva had her parental rights involuntary terminated to an older child in 2013. Based on these facts, the trial court entered an ex parte order for emergency custody on October 15, 2019. A probable-cause order followed on November 6, 2019. Eva and Jonathan were married when these orders were entered, but they subsequently divorced on December 12, 2019.

On January 28, 2020, the trial court entered an adjudication order finding V.B. and O.B. dependent-neglected due to Jonathan's parental unfitness, the condition of the home, and the condition of the children.[1] The trial court found that Eva did not contribute to the

---

[1]Although E.B. was not included in the caption of the adjudication order, he was later included as a party to the case.

dependency-neglect of the children at that time and that she was fit to allow the children to begin a trial home placement with her. The goal of the case was reunification. Both parents were ordered to maintain stable and appropriate housing, maintain reliable transportation, complete parenting classes, and comply with random drug screens. In addition, Jonathan was ordered to complete a psychological evaluation, complete domestic-violence and anger-management classes, and obtain and maintain sobriety.[2]

A review order was entered on March 10, 2020. In the review order, the trial court found Eva to be fit and ordered the children returned to her custody. The trial court noted that DHS had made reasonable efforts to provide family services. Eva was found to be in compliance with the case plan, having maintained appropriate and clean housing and having provided for the children. Jonathan was found to have made progress toward the case plan, although he had obtained drug charges and needed to comply with a drug-and-alcohol assessment and any required counseling. The goal of the case remained reunification.

On April 17, 2020, DHS filed an ex parte petition for an emergency change of custody as well as a petition for dependency-neglect.[3] DHS asserted that Jonathan continued to use drugs and that the children alleged that he had physically and sexually abused them. DHS further asserted that Eva had allowed Jonathan access to the children and had failed to protect them from his abuse. An attached affidavit alleged that although Eva had assured DHS that Jonathan would not be living with her and the children, he was found to be living

---

[2]Jonathan had tested positive for methamphetamine and amphetamine on a December 10, 2019 drug screen.

[3]E.B. was added to the caption of the case in these petitions, and he was named as a party in the remainder of the trial court's orders, including the termination order.

4

with them on April 14, 2020, and that Eva had previously divorced Jonathan only to regain custody of her children from DHS. The affidavit alleged that upon investigation of a domestic-violence dispute, it was learned that Jonathan had injured and bruised Eva and had threatened to kill her. It was also reported that V.B. and O.B. had facial bruising and that both children alleged that Jonathan had choked them until they were breathless. V.B. had disclosed that "daddy stuck his big no no in my mouth." It was alleged that E.B. had not been receiving proper feeding through his GI tube and had not been receiving necessary breathing treatments. All three children were filthy and smelled as if they had not been bathed in several days. Both parents were drug screened, and Jonathan tested positive for methamphetamine, amphetamine, and THC. The drug-screen sample provided by Eva was cool to the touch and invalid. Based on these allegations, the trial court entered an emergency order on April 17, 2020, placing all three children in DHS custody.

After holding a probable-cause hearing, the trial court entered a probable-cause order on May 4, 2020, wherein the trial court found:

> The Court finds that the Department has been involved with this family since October 2019 and that the following services as outlined in the affidavit were provided to the family: case management, foster care, medical care, referrals for parenting, homemaker services, drug screening, counseling, drug and alcohol assessment, and psychological evaluation. Despite the services offered or provided, due to the emergency, the need for removal could not be prevented. These services did not prevent removal because: On April 14, 2020, the Department responded to allegations of physical abuse, drug use, and domestic violence in the home. The Department observed the juvenile O.B. (3 years old) with a large black left eye with a triangle scrape under it and abrasions on her nose. Both girls were dirty and unkempt. The girls were taken to the Hamilton House where V.B. disclosed that her daddy choked her, pulled her hair, and slung her to the floor, and he stuck his big "no-no" in her mouth and O.B. licks her no-no and her butt. O.B. disclosed that her daddy has a gun and says he was going to shoot her mom, and that he chokes her a lot. The juvenile E.B. was seen by a physician, where it was found he had not

5

been receiving proper feeding through his GI tube, not receiving necessary breathing treatments, and was described as having not been bathed for at least a week.

On June 15, 2020, DHS filed a petition to terminate both parents' parental rights, asserting numerous statutory grounds and alleging that the children would be at significant risk of harm if returned to their parents' custody. On June 25, 2020, the trial court entered an adjudication order finding the children dependent-neglected and changing the case goal to the concurrent goal of reunification and termination of parental rights. In the adjudication order, the trial court found:

> The Court finds, and the parents stipulate by preponderance of the evidence that the juveniles are dependent-neglected as defined in the Arkansas Juvenile Code and that the allegations in the petition are true and correct, specifically, the Court finds the juveniles were neglected by both Eva Brewer and Jonathan Brewer due to parental unfitness and inadequate supervision because of the domestic violence and drug use in the home.

The case proceeded to a termination hearing on September 22 and 29, 2020.

Deputy Sheriff Joey Carnahan was the first witness to testify at the termination hearing. Deputy Carnahan testified about a hit-and-run incident that occurred in May 2020 that resulted in a seventeen-year-old boy being hospitalized with severe injuries. The boy's dirt bike had been struck from behind by a car later determined to belong to Eva Brewer. Deputy Carnahan interviewed Eva, and she stated that Jonathan had been driving her car that day and that she was a passenger. Eva stated that after Jonathan struck the boy with his car, Jonathan got out of the vehicle and moved the boy to the side of the road. The boy was asking for help and Eva wanted to help him, but Jonathan threatened Eva and insisted that they leave the scene. Jonathan was criminally charged in connection with the hit-and-run incident.

6

Deputy Carnahan also testified about a search of Eva's residence that occurred in May 2020. Deputy Carnahan stated that Jonathan was known to stay at the house, and that during the search, the police discovered fourteen grams of a green leafy substance, digital scales with a white crystal residue, a broken glass smoking device, and another glass smoking device containing white crystal residue. Jonathan denied knowledge of the contraband, stating that it was Eva's house and that anything there belonged to her. Jonathan was taken to jail, and in a recorded phone conversation, Eva told Jonathan that she had driven by the house during the police search and that she kept driving. During this phone conversation, Eva told Jonathan that she would not be returning to the house and that "they're not going to get me tonight." Deputy Carnahan stated that both Eva and Jonathan were charged with felony possession of drug paraphernalia and misdemeanor possession of a controlled substance.

Courtney McPherson is a trauma therapist for V.B. and O.B. Ms. McPherson diagnosed both girls with posttraumatic stress disorder and stated that they are both significantly emotionally delayed. Ms. McPherson testified that both girls had been sexually acting out and exhibiting behavior consistent with sexual-abuse victims. Ms. McPherson stated that V.B. and O.B. would make spontaneous comments demonstrating knowledge of sexual activity beyond their age. When speaking of her father, V.B. stated that he told V.B to tell him he has a "big d★★k," and then "he pulled his no-no out of my mouth and put it back in after I said it." Regarding this incident, V.B. stated that her "mommy said we couldn't tell anyone because it's a secret."

Ms. McPherson also testified that V.B. and O.B. reported being physically abused by their father. O.B. stated that "I saw daddy get mad and I hid behind the couch" but that "daddy hit me in the face" with his fist. O.B. then punched herself in the face to demonstrate how it happened. O.B. also stated that "one time I was running away from daddy with mommy" and then "daddy caught me, he choked me, I couldn't breathe." O.B. stated that she, her mother, and her sister frequently had to hide from her father so he would not hurt them. Both girls indicated that their mother was sometimes present when their father physically abused them, and that their mother was being physically abused as well. Ms. McPherson indicated that the statements by V.B. and O.B. were always consistent and that she found them to be credible.

Tabitha Colquitt testified that she is O.B.'s foster parent and was formerly V.B.'s foster parent. Ms. Colquitt stated that in many instances while the girls were playing, they would display sexualized behavior as well as physically aggressive behavior.

DHS caseworker Bobbie Alfonzo testified next. Ms. Alfonzo stated that during the children's trial home placement with Eva, Eva had initially been doing well and was providing a clean and appropriate home for the children. Eva was supposed to be supervising Jonathan's visitation with the children, and Eva was not to allow Jonathan in her home. However, reports of domestic violence resulted in a CACD investigation on April 14, 2020, which indicated that Jonathan was staying at Eva's home and was abusing the children. The April 14 investigation also revealed that Eva's home was in a deplorable condition.

During that investigation, Jonathan and Eva were seen "trying to run off into the woods on a four-wheeler" with all three children aboard. The investigation revealed numerous injuries to V.B. and O.B., including fresh bruises as well as other bruises of various stages. It was also discovered that E.B. was underweight and was not being fed properly through his feeding tube. The children were unkempt, and the house was dirty and full of bugs. After the children were removed, O.B. and V.B. disclosed physical and sexual abuse committed by their father. Ms. Alfonzo stated that, at the time of her investigation, it appeared that Jonathan was living in the home because some of his belongings were there, and there had been numerous reports of domestic violence in the home, including extreme altercations between Jonathan and Eva. Jonathan tested positive for methamphetamine, and the urine sample submitted by Eva was cool and invalid. Ms. Alfonzo stated that there were true findings against Eva for environmental neglect and failure to protect and true findings against Jonathan for environmental neglect and sexual abuse.

Ms. Alfonzo indicated that numerous DHS services had been offered to the parents, including random drug screens, counseling referrals, psychological-evaluation referrals, parenting classes, homemaker services, and transportation. Ms. Alfonzo thought that, despite these services, the children would be at risk of harm if returned to their parents. Ms. Alfonzo stated that O.B. and V.B. had been severely and chronically abused and that their parents could not provide the children a safe home. Ms. Alfonzo stated that although Eva demonstrated the ability to care for her children during the trial placement, after she regained custody, she placed the children back in the same harmful situation they were in before. Ms. Alfonzo indicated that Eva lacks the ability to protect the children.

As to the adoptability of the children, Ms. Alfonzo acknowledged that O.B. and V.B. are "very difficult girls with the trauma they've had." She stated, "I do believe they are adoptable, but they will need somebody very special that can love them and address the trauma that has occurred." Ms. Alfonzo testified that there are no physical conditions that would impede the children's adoption, that they are at an age that would increase the likelihood of being adopted, and that they have "lots of room to grow." Ms. Alfonzo further asserted that, even if there is an adoptability issue, the risk of harm in returning the children to their parents was so great as to outweigh the adoptability issue. Ms. Alfonzo stated, "Due to the sexual and physical abuse that they've had to deal with for their short little lives, to put them back into . . . that environment . . . would do nothing but greater harm." Ms. Alfonzo stated that the children need permanency and a life free from drugs, sexual abuse, and physical abuse, and she recommended termination of both parents' parental rights.

Another DHS employee, Gayla Baker, testified about her observations during the investigation of Eva's home on April 14, 2020. Ms. Baker said the home was

> just tore apart. Very messy. It was just—you couldn't walk through the home. It had a bad odor. Old food in all the rooms. There was an ashtray that looked like it had buds, pot, you know, from marijuana in it. It didn't look like a place that you could live in.

Ms. Baker further testified that the children "were all filthy and had a bad odor."

After the children were removed from the home for the second time in April 2020, V.B. and O.B. were interviewed by a forensic interviewer, Elsa Jasso. Ms. Jasso

10

characterized these interviews as "very non-leading." Portions of these interviews were played at the termination hearing.[4]

In V.B.'s interview, she stated that her father, Jonathan, grabbed her by the neck, choked her, and slung her down. V.B. stated that this happened "yesterday at home when momma went to the doctor." V.B. also stated that her father has a "big no-no" and that he stuck it in her mouth, and it tasted nasty. V.B. stated that this happened at the "gray house" and that "we're at the trailer now."

In O.B.'s interview, she stated that her father has a gun and "always says he's gonna shoot our momma." O.B. also indicated that her father chokes her to where she cannot breathe.

There was also a forensic interview of a third child, A.H., who is not a party to the case. A.H. was staying with the family when the dependency-neglect proceedings began, and she alleged that Jonathan had choked her to where she could not breathe. She stated that this happened more than once. A.H. also indicated in her interview that Jonathan had sexually abused her and told her to keep it a secret.

Eva Brewer testified on her own behalf. Eva confirmed that prior to this case, she had a dependency-neglect case involving her older daughter that resulted in the termination of her parental rights to that child. Eva explained that the issues in that case were her drug use and failure to comply with the case plan. Eva stated, however, that she was complying with the current case plan and was consistently testing negative on her drug screens.

---

[4]These interviews were admitted over Eva's and Jonathan's objections. Neither party challenges the admissibility of these interviews on appeal.

Eva stated that Jonathan was never violent toward her, nor had she ever seen him violent toward their children. Eva maintained that she had no knowledge of any physical or sexual abuse being committed against her children, and she stated that she would not subject her children to such abuse. With respect to her daughters' allegations of physical and sexual abuse committed by Jonathan, Eva stated that all children lie and that she had no personal knowledge of any of these things happening. Eva also stated that after the children were removed and she regained temporary custody, she allowed Jonathan only supervised visitation, and Jonathan was not staying in their home.

Eva did, however, acknowledge that Jonathan was present when DHS investigated her home on April 14, 2020, and removed the children for the second time. Moreover, Eva was a passenger in her car being driven by Jonathan the following month when the hit–and–run incident involving the seventeen–year–old boy occurred. Eva stated that she wanted to stop and render assistance to the boy but that Jonathan insisted on leaving. After initially testifying that Jonathan did not threaten her on that occasion, Eva eventually acknowledged that she had truthfully told the police that Jonathan had threatened to "beat the skin off [her] face." Eva also acknowledged the police search of her house that occurred that same month where the police found drugs and drug paraphernalia. Despite Eva's claim that Jonathan did not live there, Eva stated that all the contraband belonged to Jonathan. Eva was jailed for three months as a result of the search and seizure, and at the time of the termination hearing she was still facing felony and misdemeanor charges.

Eva stated that she loves her children and is tightly bonded with them. She pleaded with the court not to terminate her parental rights, emphasizing her lack of knowledge of any abuse and stating that she is willing to do everything DHS asked toward reunification.

Eva's mother, Cathleen Hampton, testified next. She confirmed that Eva's parental rights to her older daughter had been terminated due to drugs and other issues. Ms. Hampton stated, however, that she believed Eva had turned her life around and is now a different person. Ms. Hampton thought that Eva cares about her children and would protect them.

Jonathan Brewer was the last witness to testify. He stated that after the children were returned to Eva following their removal, he had only supervised visitation with the children and did not live in Eva's home. Jonathan denied ever physically or sexually abusing his children. At the time of the termination hearing, Jonathan was facing criminal charges in connection with the hit-and-run incident as well as the drugs and drug paraphernalia found in Eva's home. DHS also introduced evidence that Jonathan had numerous prior convictions that included possession of methamphetamine, possession of drug paraphernalia, leaving the scene of a personal-injury accident, fleeing apprehension, and two counts of first-degree terroristic threatening. Jonathan stated that he would like to retain his parental rights but that if his parental rights are terminated, he wanted Eva to have the children, and he would agree to a lifetime restraining order. Jonathan thought that Eva could protect the children and keep them safe.

On November 13, 2020, the trial court entered an order terminating Eva's and Jonathan's parental rights to V.B., O.B., and E.B. The trial court found by clear and

13

convincing evidence that termination of parental rights was in the children's best interest, and the court specifically considered the likelihood that the children would be adopted, as well as the potential harm of returning them to the custody of their parents as required by Ark. Code Ann. § 9–27–341(b)(3)(A)(i) & (ii).  The trial court found the statements by V.B. and O.B. concerning the physical and sexual abuse committed by Jonathan to be credible, and the trial court found that Eva, Eva's mother, and Jonathan lacked credibility.  The trial court found that Jonathan chronically abused his daughters, and that Eva permitted the abuse and lied to DHS about keeping Jonathan out of the home.  The trial court also found that Eva actively concealed the sexual abuse by telling V.B. to keep it a secret.  The trial court noted the caseworker's testimony that the children are adoptable, and further found that the risk of potential harm in returning them to their parents is so great that it far outweighs any potential issue regarding adoptability.  The trial court also found clear and convincing evidence of these three statutory grounds under Ark. Code Ann. § 9–27–341(b)(3)(B):

> (vi)*(a)* The court has found the juvenile or a sibling dependent-neglected as a result of neglect or abuse that could endanger the life of the child, sexual abuse, or sexual exploitation, any of which was perpetrated by the juvenile's parent or parents or stepparent or stepparents.
>
> . . . .
>
> (vii)*(a)* That other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juvenile in the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent the placement of the juvenile in the custody of the parent.
>
> . . . .

14

(ix)*(a)* The parent is found by a court of competent jurisdiction, including the juvenile division of the circuit court, to:

. . . .

*(3)(A)* Have subjected any juvenile to aggravated circumstances.

*(B)* "Aggravated circumstances" means:

*(i)* A juvenile has been abandoned, chronically abused, subjected to extreme or repeated cruelty, sexually abused, or a determination has been or is made by a judge that there is little likelihood that services to the family will result in successful reunification[.]

The trial court found that an additional statutory ground was met with respect to Eva because Eva had her parental rights involuntarily terminated as to another child. *See* Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)(4)(A)*.

### III. *Eva's Appeal*

On appeal from the termination of her parental rights, Eva does not challenge the statutory grounds supporting termination. Only one statutory ground is necessary to support termination, and Eva concedes that DHS conclusively proved a ground because her parental rights had been involuntarily terminated to an older child several years ago. Eva instead challenges the trial court's best-interest finding, arguing that (1) there was a lack of evidence that the children are likely to be adopted; (2) there was no proof that Eva poses a potential harm to her children; and (3) there was no consideration given to the effect of termination on the sibling relationship.

On the adoptability issue, Eva acknowledges that DHS caseworker Bobbie Alfonzo testified that the children are adoptable. However, Eva contends that the remaining evidence did not support this conclusion because V.B. and O.B. have significant behavioral

and emotional issues, and E.B. is a medically fragile child. Eva claims that the caseworker's generalized testimony was insufficient to meet the adoptability prong of the best-interest analysis.

Eva also argues that there was a lack of proof that she posed a risk of harm to the children if they were returned to her custody. Eva argues that although there was evidence that Jonathan abused the children, there was an absence of evidence that she was aware of the abuse. Eva notes that she was never accused of abusing her children and asserts that she divorced Jonathan and never reconciled with him. Eva also asserts that in O.B.'s and V.B.'s disclosures of abuse by Jonathan neither child gave a time frame as to when the abuse occurred. Eva contends that she was committed to protecting her children and remains committed to protecting them.

Finally, Eva argues that the best-interest analysis was flawed because it failed to address the effect termination would have on the sibling relationship. Eva relies on *Clark v. Arkansas Department of Human Services*, 2019 Ark. App. 223, 575 S.W.3d 578, a case in which we considered the sibling relationship when reviewing whether termination was in the children's best interest. Eva states that the children had been separated in foster care and that there was no evidence that they could remain an intact sibling unit following termination and adoption.

The best-interest analysis in a termination case includes the consideration of the likelihood the juvenile will be adopted and of the potential harm caused by returning custody of the child to the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii); *Brown v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 370, 584 S.W.3d 276. However, there is no

16

requirement that these factors be proved by clear and convincing evidence. *Renfro v. Ark. Dep't of Hum. Servs.*, 2011 Ark. App. 419, 385 S.W.3d 285. Rather, after consideration of all the factors, the evidence must be clear and convincing that termination is in the best interest of the children. *Id.* Considering all the evidence presented in this case, we conclude that the trial court did not clearly err in finding by clear and convincing evidence that termination of Eva's parental rights was in the children's best interest.

The termination statute does not mandate that the trial court make a specific finding that the children are adoptable, nor must the trial court find the children are "likely" to be adopted. *Hensley v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 78, 595 S.W.3d 68. The statute mandates only "consideration" of the likelihood of adoptability. In this case, the trial court clearly considered the likelihood that the children would be adopted, stating that it specifically considered the caseworker's testimony that the children are adoptable and that their adoptability was increased by their personalities, ages, placements, and health. We have held that generally a caseworker's testimony that a child is adoptable is sufficient to support an adoptability finding, *Kerr v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 271, 493 S.W.3d 342, and in this case the trial court relied on testimony to this effect. The trial court went on to find that any potential issue regarding adoptability was far outweighed by the risk of harm of returning the children to either parent's custody. This leads us into Eva's claim that she posed no risk of harm to the children.

In considering potential harm by returning the child to the parent, the trial court is not required to find that actual harm would result or affirmatively identify a potential harm. *Perry v. Ark. Dep't of Hum. Servs.*, 2021 Ark. App. 193, 625 S.W.3d 374. Potential–harm

17

evidence must be viewed in a forward-looking manner and considered in broad terms. *Id.* In determining potential harm, the court may consider past behavior as a predictor of likely potential harm should the child be returned to the parent's care and custody. *Simmons v. Ark. Dep't of Hum. Servs.*, 2021 Ark. App. 233.

Contrary to Eva's argument, there was evidence that she had knowledge of the abuse being committed by Jonathan and that she had failed to protect her children from harm. The children were first removed as a result of physical abuse committed by Jonathan against V.B. The children were subsequently returned to Eva's custody. Despite Eva's claim that she was keeping Jonathan out of her home during the custody placement, Jonathan was present along with the children when DHS investigated the home in April 2020 following a report of domestic abuse. At that time, V.B. and O.B. were observed to have bruises of varying stages—some of which were fresh—and both children subsequently disclosed having been choked and physically abused by Jonathan. There were also disclosures by the children that Eva had observed some of the physical abuse committed against them and was herself being abused by Jonathan. Moreover, V.B. disclosed to her therapist sexual abuse committed by Jonathan and reportedly stated, "[M]omma said we couldn't tell anyone because it's a secret."

In addition to the physical and sexual abuse committed against the children, there was testimony that during the April 2020 investigation, Eva's home was in a deplorable and virtually unlivable condition and that all three children were filthy and had not been bathed in several days. The youngest child, E.B., who has special needs, was underweight and was not being properly fed through his feeding tube. When the children were removed this

second time, Jonathan tested positive for methamphetamine and Eva gave a cool and invalid urine sample. Just a month later, a police search of Eva's home uncovered suspected drugs and drug paraphernalia for which Eva was facing felony charges. The distressing condition of Eva's home and the children belies her argument that she posed no threat of harm to the children.

Finally, although Eva contends that the termination of her parental rights may result in the severing of the sibling relationship, we conclude that this factor is an insufficient basis upon which to reverse the termination of Eva's parental rights considering the remaining evidence. On the totality of this record, leaving the credibility decisions to the trial court, we hold that the trial court's finding that the termination of Eva's parental rights was in the children's best interest was not clearly erroneous. Therefore, we affirm the termination of Eva's parental rights.

## IV. *Jonathan's Appeal*

In Jonathan's appeal, he does not challenge the statutory grounds supporting termination of his parental rights. Jonathan concedes that he would be unable to overcome the statutory ground of aggravated circumstances because of the evidence that he had committed sexual abuse against a child.

Jonathan, instead, challenges the trial court's finding that termination of his parental rights was in the children's best interest and that the children would be at risk of harm if returned to his custody. Under this point, Jonathan also complains that DHS did not make reasonable efforts to rehabilitate him or make him a safe placement for the children.

19

Asserting that DHS had "unclean hands"[5] by failing to offer appropriate services, Jonathan asks that the termination of his parental rights be reversed.

We reject Jonathan's argument. As Jonathan recognizes, he cannot challenge the statutory grounds supporting termination. Despite Jonathan's claim that DHS services were not provided, the aggravated-circumstances ground found by the trial court does not require DHS to prove that meaningful services toward reunification were provided. *Willis v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 559, 538 S.W.3d 842. Nevertheless, the testimony of the caseworker indicated that DHS did offer numerous services to Jonathan during the case.

But regardless of the extent of DHS services, there was evidence that Jonathan sexually and physically abused his children. Jonathan also tested positive for methamphetamine on multiple occasions during the case and faced felony drug charges at the time of the termination hearing. These factors bear directly on the best interest of the children. In light of this evidence, we have no hesitation in concluding that Jonathan posed a risk of harm to his children and that the trial court's decision to terminate his parental rights was not clearly erroneous. Therefore, we affirm the termination order as to Jonathan as well.

## V. *Conclusion*

For the foregoing reasons, we hold that the trial court did not clearly err in finding that termination of both parents' parental rights was in the best interest of the children. Accordingly, we affirm both Eva's termination and Jonathan's termination.

---

[5]Jonathan offers no case in which a termination of parental rights was reversed on appeal based on DHS's alleged "unclean hands."

20

Affirmed.

ABRAMSON and VIRDEN, JJ., agree.

*Tabitha McNulty*, Arkansas Commission for Parent Counsel, for separate appellant Eva Brewer.

*Dusti Standridge*, for separate appellant Jonathan Brewer.

*Andrew Firth*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor children.