2010 Ark. App. 614

**Latrice GILMORE, Appellant**

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES, Appellee.**

**No. CA 10–316.**

Court of Appeals of Arkansas.

Sept. 22, 2010.

David O. Bowden, Little Rock, for appellant.

Melissa Bristow Richardson, Jonesboro, for appellee.

JOSEPHINE LINKER HART, Judge.

Appellant, Latrice Gilmore, is the mother of R.S., born on August 30, 1997. The circuit court terminated her parental rights to her son on December 22, 2009, after the child had been out of the home since July 22, 2008. The trial court found that Gilmore had not remedied the conditions that caused removal. We affirm.

Gilmore, who had legal custody, left R.S. with his father, Robert Stevenson, her erstwhile husband, when she moved to Dallas to attend beauty school. DHS exercised an emergency hold on the child on July 22, 2008, after an allegation of physical abuse was made against the father. The affidavit supporting the petition for emergency custody stated that the father had choked and hit R.S., had thrown him head-first into a couch, and had struck him with a belt. According to the affidavit, when the family-service worker contacted Gilmore about her son having been taken into emergency custody, Gilmore stated that the child could either go to foster care or to the father. She further remarked that

[s]he gave permission for the dad to beat his ass because he deserved it. If she came to do it, it would be worse. She is twenty-nine years old and she is a business woman. Her son can stay in foster care until she comes to get him next year.

Refusing to give her address, she hung up on the family-service worker, but then called several more times, each time uttering profanities.

On September 16, 2008, the trial court held an adjudication hearing, found the child dependent-neglected, and granted supervised visitation to Gilmore. The court found that Robert had abused R.S. and observed as follows:

Latrice Gilmore, mother, is an unfit parent. Ms. Gilmore is not a credible witness. She is not emotionally or mentally stable. The determination of her exact pathology, the court will leave to the professionals, but there is something seriously wrong with Ms. Gilmore. In addition, Ms. Gilmore has had a criminal history since childhood. She has personal conflicts with many people, which often includes cursing people and yelling at people. When the court was announcing its ruling, Ms. Gilmore was on the verge of being held in contempt of court due to her continuing outward displays of emotion and muttering. Ms. Gilmore has also physically abused R.S. The court currently considers Mr. S. to be a better prospect for reunification.

Establishing a goal of reunification of the child with the mother, the court ordered Gilmore to submit to a psychological evaluation, random drug screens, and recommended family therapy. The court also noted that if Gilmore continued to harass DHS staff, the agency could discontinue contact.

The court held the first permanency-planning hearing on January 27, 2009. In the order, the court continued the goal of reunification although it found that no progress to achieving that goal had been made. The court found that DHS had not made reasonable efforts to provide services. It ordered DHS to change case workers, noting that Gilmore could be a "difficult person to deal with" and that the case worker had failed to return Gilmore's phone calls. The court also found Gilmore in contempt of court and ordered her to be jailed for twenty-four hours, stating that

> Ms. Gilmore continuously ignored court directives to remain silent when the court was ruling on certain matters before it. Ms. Gilmore's continued talking in defiance of court orders to remain silent, even after fair warning that she would be held in contempt of court if she continued to persist, showed contempt of court on her part.

Dr. Paul Deyoub performed a psychological evaluation on Gilmore on April 17, 2009. Dr. Deyoub stated that he had seen Gilmore when she was fifteen years old and in juvenile detention and that he had diagnosed her with a conduct disorder. Dr. Deyoub diagnosed Gilmore with poly-substance dependency and a personality disorder and explained that

> Latrice Gilmore shows no interest in raising R.S., she is completely unsympathetic to him, and she even indicated in the evaluation that she would have done the same thing, which was to abuse R.S. She blames her family members for all of her problems, I think she is unfit to parent R.S., she basically abandoned him for the last two years, and I saw nothing in her attitude that would

indicate that she would be a proper parent.

The court held another permanency-planning hearing on May 26, 2009, and continued the goal of reunification.[1] It ordered Gilmore to follow the recommendations of her psychological evaluation, including out-patient drug treatment, parenting classes, individual counseling, and family counseling.

The court held another permanency-planning hearing on August 25, 2009. The court stated that there were no compelling reasons to continue the goal of reunification and changed it to termination, explaining that

> [t]he mother has not materially cooperated with the court orders and has not benefitted from the services. She failed to appear for today's hearing. The mother was seen prior to the hearing today but left reportedly due to the possibility of being attacked by a relative and a professed lack of protection from such a threat. The mother has acted inappropriately in family therapy sessions. She is an unfit parent.

The court found that DHS had made reasonable efforts to provide services to achieve the goal of reunification.

After R.S. was taken into DHS's custody and placed in foster care, he had two acute-care psychiatric hospitalizations. He was admitted to Youth Home on November 24, 2008, and was discharged on September 30, 2009, to the Second Chance Ranch. While at Youth Home, he was found to be a victim of abuse and neglect and diagnosed with major depressive disorder, anxiety disorder, oppositional-defiant disorder, and parent-child relational problems. The Youth Home discharge re-

---

1. The court erroneously stated in the order that DHS had not made reasonable efforts to provide reunification services. In the termination order, the trial court noted this clerical error and modified it to state that DHS had made reasonable efforts.

port stated that R.S. did significantly better when he had no contact with his parents, and when he was required to have family-therapy sessions or any family contact, his mood and behavior deteriorated and he had severe panic attacks and poor impulse control. In August 2009, Youth Home's treatment team made the decision to stop all contact with R.S.'s parents and family, and after that, he improved. The report stated: "This child's whole life has been marked with witnessing chaos, drama and violence."

The August 25, 2009 court report prepared by Sheila Conroy, R.S.'s therapist at Youth Home, stated that Gilmore was not capable of raising her son and had not shown a consistent desire to do so. She explained that

> R.S. has been very frightened to address any concerns or bring up any issues as they relate to the relationship with his mother. Since we started family therapy R.S. has been having panic attacks. Per his medical history he has had these in the past, however, these are the first we have witnessed them. His anxiety, he says, is because he feels that he constantly lets his mother down. He fears the biggest let down, which will be when he tells the judge that he doesn't want to live with her. R.S. repeatedly express his fear of her and does not trust her. He believes that she will again abandon him, as she has done many times in the past by leaving him with some relative or his father. Ms. Gilmore has certainly demonstrated and expressed her love and care for her child. However, [she] has demonstrated her inability to adequately parent this child by providing for his emotional needs and disturbances. Ms. Gilmore does not even acknowledge his emotional issues.

Gilmore tested positive for THC on both September 28 and October 22, 2009. In November 2009, Romulus Henry, a social worker, sent a letter to DHS stating that, although DHS had attempted to set up individual counseling for Gilmore in March 2009, Gilmore had advised him that he should not call her again; nevertheless, Henry and DHS made further efforts to bring Gilmore in for therapy from April through the end of September 2009. Henry wrote that on October 7, 2009, Gilmore showed up for her first therapy appointment and after that, attended five additional appointments. Henry concluded as follows:

> Mrs. Gilmore initially entered treatment with a very poor, argumentative and blaming attitude. She admitted to using profanity towards Department of Human Services' staff, complained about Juvenile Court staff and had nothing good to say about anyone. During the third session (October 20th), Mrs. Gilmore's attitude improved, and she agreed to participate fully in therapy. It is my clinical opinion that Mrs. Gilmore would benefit from addressing the following issues in treatment:
>
> 1. Learn how to effectively manage her anger;
> 2. Gain insight into interpersonal conflict with family members[;] and
> 3. Address ambivalence in regards to receiving therapy services.
>
> Mrs. Gilmore has limited insight into the dynamics of substance abuse. She verbalizes that she attends narcotic anonymous meetings; however, she indicated that she does not feel that she has a drug addiction. Mrs. Gilmore would benefit from having a sponsor to help her with developing a sobriety maintenance plan.
>
> In summary, I recommend that she continues in weekly individual counsel-

ing to address the aforementioned problem areas. Should you need additional information, please feel free to contact me.

At the termination hearing held November 16, 2009, Dr. Deyoub testified that Gilmore did not have the ability at that time to be a parent to R.S. and would not acquire that ability in the future. He said that he did not believe that she had much regard for R.S. and that even with therapy, it would be difficult to change her lack of attachment to the child. He said that she would have to receive therapy, substance-abuse and anger-management counseling, and demonstrate that she had significantly changed. He stated that since she was a teenager she had major behavior and personal problems, and he described her as antisocial, hostile, and short-tempered. He said that because she was thirty years old, her borderline personality disorder had become ingrained and would be harder to change as time went on.

Sheila Conroy, R.S.'s therapist at Youth Home, testified that she had not immediately pursued family therapy, as Gilmore had not been motivated to begin or to follow the plan, and Gilmore began family therapy after the June 2009 hearing and met with R.S. about five times. Conroy said that Gilmore's behavior was very inconsistent. At times, she would be loving to R.S., but at other times, she would ridicule him. She said that Gilmore's attendance was inconsistent and that she often did not return R.S.'s phone calls. Conroy said the last family session was before the August 25, 2009 court date. She stated that Gilmore focused on what "R.S. needed to do" instead of "what she needed to do" as a parent. Conroy said that after August 2009, she decided that they would no longer continue with meetings between R.S. and his mother because he deteriorated after each contact.

At that point in the hearing, Gilmore asked to be excused from the hearing. The court stated that Gilmore had the right to leave if she wished to do so. She remained. Conroy further testified that she did not believe that Gilmore was stable enough or sufficiently consistent to be a parent to R.S. She said that R.S. did not trust his mother because she frequently criticized him and was inconsistent with her approach. At this point, the court again addressed Gilmore and warned her to stop muttering in court. Conroy concluded that she did not believe that Gilmore would be able to improve.

Romulus Henry testified about Gilmore's counseling over the past month. He noted Gilmore's reluctance to begin therapy and reported that according to Gilmore, she was not the one who had abused her son but was having to answer for it. He said that she blamed the "system," including DHS, the court, and her family members. Nevertheless, she had indicated that she was willing to work on those issues and to comply with what was expected of her. He opined that she had very little insight at that point and that he was unsure whether she would ever acquire it. He stated that she had begun to develop a relationship with him to facilitate counseling and that he had seen a change for the better. He said, however, that Gilmore's wanting to walk out of the hearing was not an encouraging sign.

Tabitha Watson, the family-service worker, testified that Gilmore did not attend parenting classes and had in September begun to participate in services such as drug screens, supervised visitation, and individual counseling. Watson said that Gilmore had gone to Youth Home for family sessions in the summer but had not done so consistently, and when she sat in on a visit between Gilmore and R.S. at Youth Home, she found Gilmore's interaction with R.S. to be inappropriate. She

said that she did not believe Gilmore had benefitted from reunification services. Watson said that after the last hearing, Gilmore had threatened her. Watson further noted that although Gilmore had begun to participate in services in September, it was in R.S.'s best interest that Gilmore's rights be terminated as after sixteen months R.S. needed permanency. She added that, although the recent visits had gone fairly well, she believed that Gilmore's last-minute improved behavior was not sincere.

Gilmore testified that, after living in Dallas throughout the case, she had obtained her hair stylist's license in May or June 2009, that she had moved to Arkansas, and that she was in a position to take R.S. back. She also testified about having worked at Chili's, as a stylist, and as a tax preparer. She stated that she was grossing between $2000 and $3500 a month and was still on unemployment. She said that she did not believe that R.S.'s father had abused him, nor did she believe that she had emotionally abused R.S.

■ Gilmore argues on appeal that the trial court erred because she was not provided with meaningful reunification services, given her psychological impairment (borderline personality disorder with antisocial features of long-standing), as required by the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101.[2] She argues that the court should have given her additional reunification services and a longer period of time to work on the goal of reunification. Gilmore, however, did not raise or establish that she was entitled to

ADA protection, nor did the trial court make any ruling on that argument. It is, therefore, not preserved for appellate review. *Ruble v. Ark. Dep't of Human Servs.*, 75 Ark.App. 321, 57 S.W.3d 233 (2001). For the first time on appeal, she also argues that due process required that her impairment be reasonably accommodated. We will not address constitutional arguments that were not raised below. *Seago v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 767, 360 S.W.3d 733.

We affirm the trial court's refusal to give appellant more time to work on reunification, even though she made some minor progress in the two months before the termination hearing. Arkansas Code Annotated section 9–27–341(a)(4)(A) (Repl. 2009) provides: "A parent's resumption of contact or overtures toward participating in the case plan or following the orders of the court following the permanency planning hearing and preceding the termination of parental rights hearing is an insufficient reason to not terminate parental rights." Moreover, there was little indication that Gilmore would ever become an adequate parent to R.S. She never acknowledged that R.S.'s father had abused him, that she had placed him in a vulnerable situation, that she had emotionally abused him, or that she needed to change.

Affirmed.

VAUGHT, C.J., and PITTMAN J., agree.

---

**2.** In order to qualify for protection under the Americans with Disabilities Act, the proponent must establish that she suffered from disability. Under the act, "disability" is defined at 42 U.S.C. § 12102(1), which reads as follows:

  The term "disability" means, with respect to an individual—

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
(B) a record of such impairment; or
(C) being regarded as having such an impairment.