2011 Ark. App. 596

**Angela BURNETT and Quinton Harris, Appellants**

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES; Minor Children, Appellees.**

**No. CA 11–456.**

Court of Appeals of Arkansas.

Oct. 5, 2011.

Leah Beth Lanford, Little Rock, for appellants.

Melissa Bristow Richardson, Jonesboro, AR, Tabitha Baertels McNulty, Little Rock, for appellees.

DOUG MARTIN, Judge.

The Perry County Circuit Court terminated the parental rights of appellants, Angela Burnett and Quinton Harris, to their two minor children, D.H.1 and D.H.2, aged four and six years at the time of termination. The parents have filed separate appeals. Burnett argues that the Arkansas Department of Human Services (DHS) violated the Americans with Disabilities Act (ADA) by failing to provide her reasonable accommodations as an alcoholic; that DHS did not prove the likelihood of adoption for her children; and that there was insufficient evidence to show that termination was in the children's best interest. Harris does not challenge the statutory grounds for termination found by the trial court; rather, he joins Burnett in arguing that DHS failed to provide sufficient evidence of the likelihood that his children would be adopted. We find no error in the trial court's decision terminating the parties' parental rights and, therefore, affirm.

DHS became involved with this family on July 5, 2009, when Burnett was arrested for domestic battery. Jason Parker, Burnett's boyfriend, was also arrested and charged with domestic battery, disorderly conduct, felony criminal mischief, and violation of a no-contact order pertaining to him and Burnett. Both Burnett and Parker were intoxicated during their fight with one another. D.H.1 and D.H.2 were present and saw Parker kick in the window of a police officer's patrol car. The children were left with their maternal great-grandmother, Mildred Brothers, who was approximately eighty-five years old at the time.

On July 8, 2009, the trial court granted DHS's emergency ex parte order, and the children were placed in the custody of DHS. A probable-cause hearing was held on July 13, 2009, at which D.H.1 and D.H.2 were found to be dependent-neglected.

At the time of Burnett's arrest resulting in the children's placement in DHS custody, Harris was incarcerated for theft by receiving, child endangerment, and fleeing. The child-endangerment charge involved D.H.1.

Burnett remained in jail for twenty-five days on the domestic-battery charge and was released on July 31, 2009. Upon Burnett's release from jail, DHS began providing her with services, including a psychological evaluation and a drug-and-alcohol assessment. During this period of time, Burnett lived with Brothers and visited D.H.1 and D.H.2.

Harris was released from prison on November 25, 2009, but in April 2010, he was arrested for parole violations and on new charges, including rape, residential burglary, terroristic threatening, and third-degree battery.

DHS petitioned for termination of both Burnett's and Harris's parental rights on

July 16, 2010; however, DHS subsequently filed a "Motion for Trial Placement with Mother" on July 23, 2010, on the basis that DHS had become aware of new intensive family services (IFS) and wanted to give the family one last attempt at reunification. Pursuant to the sixty-day trial placement, Burnett was required to live with D.H.1 and D.H.2 at Brothers's house; Burnett was to have no contact with her boyfriend at that time, Jerry Townes; the children were not to be left unsupervised with Brothers because of her age and D.H.1's violent outbursts; Burnett was ordered to refrain from consuming any alcoholic beverages and to submit to Breathalyzer testing; and Burnett was ordered to cooperate with the IFS therapist and case manager.

On August 16, 2010, the trial court granted DHS's motion to dismiss its petition for termination of parental rights. In addition, because the trial placement with Burnett was going well, the trial court granted DHS's motion to return custody of the children to Burnett on September 29, 2010.

At a review hearing on October 8, 2010, Destini Trusty, a therapist, testified that Burnett had made "tremendous progress," despite her relapse with alcoholism. Trusty petitioned for and was granted an additional two weeks of IFS for Burnett. Also, a "safety plan" was created, which required Burnett to enter a rehabilitation center within five days if she tested positive for alcohol use. At the conclusion of the hearing, the trial court found that it was in the children's best interest to remain in Burnett's custody.

Three days after the expiration of the IFS program, DHS removed D.H.1 and D.H.2 from Burnett's custody based on Burnett's continued alcohol abuse and the fact that she left the children unsupervised with Brothers. On October 21, 2010, the trial court granted DHS's ex parte emergency motion for change of custody based on the affidavit of family service worker, Nancy Shaikh, who testified that, on October 12, 2010, Burnett tested positive for alcohol use. Rather than entering the rehabilitation center, as she had agreed, Burnett left the state of Arkansas with her boyfriend for a trip to Texas, stating that she "needed a break before [she] went back into rehab." Although Burnett stated that she planned to be back by Sunday, October 17, Burnett had not returned to Arkansas as of Monday, October 18. Burnett had left D.H.1 and D.H.2 with a friend, who subsequently took the children to Brothers's house. On Tuesday, October 19, 2010, Burnett contacted DHS and informed the Department that she was still in Texas and that a friend was wiring money to facilitate her return to Arkansas. On the same day, DHS regained custody of the children.

At the emergency-review hearing on October 27, 2010, Burnett admitted drinking alcohol prior to the October 8, 2010 hearing and stated that, in fact, she drank "about a pint" of alcohol on the day before the emergency-review hearing. The trial court found that Burnett was not compliant with the case plan, in spite of the family services provided by DHS. On November 29, 2010, DHS filed an amended petition for termination of Burnett's and Harris's parental rights.

At the termination hearing held on January 14, 2011, Rebecca Kincannon, an adoption specialist for the Division of Children and Family Services (DCFS), testified that D.H.1 and D.H.2 were adoptable. According to Kincannon, factors weighing in favor of adoption for the boys were their ages and race. In response to an email Kincannon sent the previous day describing the children's characteristics, she received a possible placement for the

children. In describing the adoption-recruitment efforts, Kincannon testified that DCFS utilizes the Arkansas Heart Gallery's website; DCFS holds "adoption picnics" where the children's photographs will be displayed; and additional emails will be sent statewide to other adoption specialists. Kincannon also stated that DCFS uses a "matching list run" but that the machine was currently broken and DCFS hoped to have it operating later that month. The only potential problems Kincannon noted with regard to the likelihood of adoption for the children were D.H.1's behavioral issues and medical condition.

Casey Myers, DCFS unit supervisor, testified that she had worked with DCFS for twenty-two years and had worked with this family since the case was opened. Myers stated that D.H.1 has Hirschsprung's disease [1] but that "he also poops in his pants on purpose too when he doesn't get his way." According to Myers, when Burnett came to therapy sessions after she had been drinking alcohol, D.H.1 exhibited "severe reactions," including jumping from a moving vehicle and running into traffic saying he "just wanted to be with Jesus." Myers testified that Burnett acknowledged that D.H.1 exhibited such behavior because he was aware that she had been drinking alcohol. Also, Myers testified that D.H.1 is "very, very physical" with women and often refers to women, including Burnett, as "bitches." With respect to D.H.2, Myers stated that "you couldn't ask for a better child." Myers testified that the children should not have been left alone with Brothers because D.H.1 had kicked her "during one of his manic fits."

According to Myers, DCFS had looked into placing the children with their paternal grandparents, Donald and Sarah Harris, but it was alleged that another grandchild living in their home at that time had molested D.H.1. Although the sexual-abuse allegation was later determined to be "unfounded," DCFS nevertheless believed D.H.1 was sexually abused based on his behavior. Myers stated that her greatest concern was the paternal grandparents' refusal to believe D.H.1 was molested.

Myers stated that she "absolutely cannot recommend that the children go with either parent today." She stated that, although the parents love D.H.1 and D.H.2, it is not in the children's best interests to be with Burnett or Harris. Myers noted that Burnett and Harris were given a longer amount of time to comply with the case plan than most parents receive. Myers also stated that Burnett had told her that "going to AA classes is hard on her because it makes her want to drink." Myers testified that, after testing positive for alcohol use on October 12, 2010, Burnett did not enter a rehabilitation center until December 21, 2010. Further, Myers testified that Burnett said if the court ordered termination of her parental rights, she would leave the rehabilitation center immediately.

With regard to the likelihood of adoption for D.H.1 and D.H.2, Myers stated that she believed the children are "very adoptable" and described them as "beautiful children." She stated that the only possible "lag" in the adoption process could be with respect to D.H.1's behavioral issues. Myers, however, stated that there was "a very high probability" that the children could be adopted as a sibling pair and that it would be in their best interest to stay together.

Shaikh, the family service worker at DCFS, testified that, although Burnett

---

1. Hirschsprung's disease, also known as "megacolon," is a congenital condition caused by blockage of the large intestine due to improper muscle movement in the bowel.

was scheduled twice to return to the rehabilitation center, Burnett did not enter the rehabilitation center at those appointed times. Shaikh testified, however, that Burnett was currently at the rehabilitation center and that Burnett told her that she liked the program at New Beginnings, felt that it was beneficial, and was glad it was a ninety-day program.

Rebecca Latture, Jason Parker's mother, testified that, after Parker was arrested in July 2009, he and Burnett continued to correspond while Parker was incarcerated, despite a no-contact order. Latture testified that Parker was staying at her house while he was on parole but that he subsequently moved into a trailer next to her house. Latture stated that, as soon as her son moved into the trailer, Burnett moved in with him. Latture testified that Parker and Burnett's past relationship "was pretty violent." Latture stated that, before Parker moved into the trailer, Latture had contacted the prosecuting attorney to report that Burnett was calling Latture's home "every two minutes."

Donald Harris, Quinton Harris's father, testified that he and his wife of forty-three years wanted D.H.1 and D.H.2 to be placed with them. Donald denied that he or his wife had ever told D.H.1 that bears or wolves would get him and stated that they did not threaten to "bop" the boys on their heads. Donald stated that he and his wife had no behavioral issues with D.H.1 while he was in their home but agreed that D.H.1 is "very troubled." Donald acknowledged that Harris had been to jail over five times but insisted that, although Harris never worked to provide for his children, his son was an "excellent father" to D.H.1 and D.H.2. Throughout the proceedings, Harris urged the trial court to place the children with his parents, rather than terminating his parental rights.

At a time when the case-plan goal was reunification with Burnett, the trial court's directives for achieving that goal included (1) parenting classes; (2) anger-management classes; (3) forensic psychological evaluation, and follow recommendations; (4) counseling (individual), and follow recommendations; (5) counseling (family), and follow recommendations; (6) random drug screens; (7) remain drug free; (8) remain alcohol free; (9) drug-and-alcohol assessment, and follow recommendations; (10) residential treatment for drugs/alcohol, and follow recommendations; (11) AA/NA attendance four times per week; (12) provide sign-in sheets for AA/NA; (13) take any prescribed medications; (14) intensive in-home services; (15) maintain stable and suitable housing; (16) maintain stable employment; (17) demonstrate ability to financially support self (stable income); (18) attend staffings at DHS; (19) comply with terms of case plan; (20) cooperate with Department; (21) maintain contact with Department; (22) attend visitations with juveniles in therapy; (23) demonstrate improved parenting; (24) maintain reliable transportation or seek assistance from DHS; (25) refrain from criminal or illegal activity; (26) no alcohol consumption; and (27) submit to breath tests as requested.

The trial court acknowledged that Burnett had utilized most of the services provided by DHS but noted that she failed to obey several court orders. Burnett failed to remain alcohol free in that she drank alcohol after D.H.1 and D.H.2 were returned to her custody in September 2010. The children were thereafter removed from Burnett's custody a second time in October 2010 based on Burnett's continued alcohol abuse. Burnett completed one residential treatment program for alcoholism, to no avail. Burnett admitted that she did not follow the aftercare plan and had not

abstained from alcohol. Burnett failed to attend AA/NA meetings and provide sign-in sheets. Burnett failed to maintain any employment during the pendency of the action. Burnett did not demonstrate improved parenting in that she did not abstain from alcohol and also left the children with Brothers, who was found to be an unsatisfactory supervisor. Also, Burnett resumed her relationship with Parker, despite a no-contact order, essentially placing herself back in the situation that caused the children to be removed from her custody. Although Burnett had been ordered to remain at Brothers's home, she left D.H.1 and D.H.2 with a friend, who in turn took them back to Brothers, and went to Texas with her boyfriend after testing positive for alcohol use. Finally, Burnett failed to enter a rehabilitation center for the second time until December 21, 2010, only three weeks prior to the termination hearing.

The trial court had similar directives for achieving the goal of reunification with Harris, with the additional order that he pay child support for D.H.1 and D.H.2. The trial court found that Harris wholly failed to comply with the court's orders and the case plan and that he failed to utilize the services offered by DHS. After Harris was released from prison, he failed to submit to a drug screen and, at the January 2010 permanency-planning hearing, tested positive for THC, the active ingredient in marijuana, and cocaine. Harris failed to maintain employment and support himself for several months when he was not incarcerated. Although Harris was ordered to pay $74 per week in child support, Harris had not paid any sums of money for the care and benefit of his children. Finally, Harris failed to refrain from criminal activity in that he was again incarcerated, awaiting trial on a Class Y felony charge and a revocation hearing for parole violations.

On February 11, 2011, the trial court entered an order terminating Burnett's and Harris's parental rights to D.H.1 and D.H.2 and granting DHS power to consent to the children's adoption. The trial court terminated parental rights on the grounds that the children were adjudicated dependent/neglected and had been out of the parents' home(s) for more than twelve months and that other factors or issues arose subsequent to the original petition that demonstrated that return to the parents was contrary to the children's health, safety, and welfare. Specifically, the trial court found that both Burnett and Harris continued to abuse drugs in spite of efforts made by DHS to rehabilitate the family. In considering the issue of adoption, the trial court found "a high likelihood of adoption" based on testimony presented at the hearing.

We review termination-of-parental-rights cases de novo. *Meriweather v. Ark. Dep't of Human Servs.*, 98 Ark.App. 328, 255 S.W.3d 505 (2007). In cases where the issue is one of termination of parental rights, there is a heavy burden placed upon the party seeking to terminate the relationship. *Trout v. Ark. Dep't of Human Servs.*, 359 Ark. 283, 197 S.W.3d 486 (2004). Termination of parental rights is an extreme remedy in derogation of the natural rights of the parents. *Id.* Nevertheless, parental rights will not be enforced to the detriment or destruction of the health and well being of the child and must give way to the best interest of the child when the natural parents seriously fail to provide reasonable care for their minor children. *Camarillo–Cox v. Ark. Dep't of Human Servs.*, 360 Ark. 340, 201 S.W.3d 391 (2005). Pursuant to Arkansas Code Annotated section 9–27–341(b)(3) (Repl.2009), an order terminating parental rights must be based upon clear and con-

vincing evidence, i.e., proof that will produce in the fact-finder a firm conviction as to the verity of the allegation sought to be established. *Camarillo–Cox, supra.* A finding is clearly erroneous when the appellate court is, on the entire evidence, left with a definite and firm conviction that a mistake has been made. *Id.* In deciding whether a finding of the trial court is clearly erroneous, we give great deference to the superior opportunity of the trial court to observe the parties and judge the credibility of witnesses. *Id.*

Pursuant to Ark.Code Ann. § 9–27–341(b)(3)(A), an order terminating parental rights must be based on a finding that termination is in the child's best interest, which includes consideration of the likelihood that the juvenile will be adopted and the potential harm caused by returning custody of the child to the parents. Also, an appropriate permanency-placement plan is a prerequisite to the circuit court's consideration of a termination petition. Ark.Code Ann. § 9–27–341(b)(1)(A). In addition, the proof must establish at least one of several statutory grounds set forth in Ark.Code Ann. § 9–27–341(b)(3)(B), which provides in relevant part:

(i)(*a*) That a juvenile has been adjudicated by the court to be dependent-neglected and has continued to be out of the custody of the parent for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent.

. . . .

(vii)(*a*) That other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that return of the juvenile to the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent return of the juvenile to the custody of the parent.

◼ In her first point on appeal, Burnett maintains that she suffers from a disability in that she is an alcoholic and that, as such, DHS was required by the ADA to make reasonable accommodations for her in light of her "disabling disease." Burnett, however, did not raise this argument below and did not establish entitlement to protection pursuant to the ADA. The trial court made no ruling on the argument Burnett now raises; therefore, it is not preserved for appellate review. *See Gilmore v. Ark. Dep't of Human Servs.,* 2010 Ark. App. 614, 379 S.W.3d 501 (citing *Ruble v. Ark. Dep't of Human Servs.,* 75 Ark.App. 321, 57 S.W.3d 233 (2001)).

◼ Next, Burnett contends that, "[t]he likelihood of adoptability was not proven[,] thus negating the best interest analysis by the court." This court held in *Renfro v. Ark. Dep't of Human Servs.,* 2011 Ark. App. 419, 385 S.W.3d 285 that "adoptability is *but one factor* that is considered when making a best-interest determination." *Renfro,* at 6, 385 S.W.3d 285 (emphasis in original). Moreover, this court has held that there is no requirement in the statute that every factor must be established by clear and convincing evidence; rather, after consideration of all the factors, the evidence must be clear and convincing that the termination is in the best interest of the children. *Id.* In its order terminating parental rights, the trial court expressly considered the likelihood that D.H.1 and D.H.2 would be adopted in its overall determination of the children's best interest, thus satisfying the statutory requirements.

Burnett argues that the trial court heard "absolutely no evidence" regarding the likelihood that the children would be adopted. Similarly, Harris contends that the evidence supporting adoptability was insufficient, pointing to "Kincannon's lack of preparation for court, the broken data-match program, and Myer's [sic] testimony regarding D.H.(1)'s significant barriers to adoption." Both Burnett and Harris cite *Dean v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 198, 299 S.W.3d 537, wherein this court cautioned DHS not to be "cavalier" in producing evidence of adoptability, given that DHS has the burden of proof at trial. *Dean*, 2009 Ark. App. 198, at 3, 299 S.W.3d at 539. In that case, however, DHS provided the trial court with *no evidence* whatsoever concerning the likelihood of adoption for those children. Unlike *Dean*, evidence regarding the likelihood of adoption for D.H.1 and D.H.2 was presented for the trial court's best-interest determination.

Kincannon testified that the children are adoptable and stated that factors in favor of their adoption include their ages and race. Moreover, Kincannon identified a possible placement for the children. While both Kincannon and Myers expressed concern over placement for D.H.1, considering his behavioral issues and medical condition, Myers nevertheless testified that there was "a very high probability that [D.H.1 and D.H.2] would be adopted together." After hearing this testimony, the trial court concluded that the children would likely be adopted. We cannot say the trial court clearly erred in its assessment of the evidence.

Burnett maintains that DHS did not provide clear and convincing evidence of statutory grounds for termination, other than the fact that D.H.1 and D.H.2 had lived outside her home for twelve months. Indeed, except for the brief period that Burnett had custody of the children during the trial placement, D.H.1 and D.H.2 remained outside of Burnett's home for over eighteen months. Burnett challenges the second aspect of Ark.Code Ann. § 9–27–341(b)(3)(B)(i)(*a*), in that Burnett maintains that she completed "a significant portion of the case plan and was working toward remedying the situations that caused removal."

Progress toward or even completion of the case plan is no bar to termination of parental rights. *Camarillo–Cox, supra.* It is well settled that evidence that a parent begins to make improvement as termination becomes more imminent will not outweigh other evidence demonstrating a failure to comply and remedy the situation that caused the children to be removed in the first place. *Id.* That Burnett completed "a significant portion" of the case plan is not determinative of the outcome of these proceedings, given that Burnett's efforts at completion of the case plan did not achieve the intended result of making Burnett a parent capable of caring for D.H.1 and D.H.2. Despite the services provided by DHS, Burnett continued to abuse alcohol and thus failed to remedy the conditions that caused the children's removal from her custody.

With respect to the trial court's second ground for termination, Burnett concedes that she suffered a relapse with alcoholism but essentially blames DHS. Burnett maintains that DHS knew she could suffer a relapse with alcoholism and did not adequately prepare for its occurrence. On the contrary, Burnett agreed to enter a rehabilitation center within five days of testing positive for alcohol use. In other words, a satisfactory plan was established in the event of Burnett's relapse with alcoholism. It is through no fault of DHS that Burnett failed to imple-

ment the plan, putting her own need for "a break" above the needs of her children.

Burnett further admits that she is living with Parker, in direct violation of a no-contact order, but she maintains that Latture offered no evidence that there had been any domestic violence since they resumed their relationship. That Burnett would again expose D.H.1 and D.H.2 to her volatile relationship with Parker, which precipitated the children's removal from Burnett's custody in July 2009, demonstrates Burnett's indifference to remedying her conditions in order to prevent the termination of her parental rights. Under these circumstances, we are not left with a definite and firm conviction that a mistake was made. Accordingly, we affirm the trial court's termination of Burnett's parental rights.

For the reasons cited herein, we affirm the termination of both Burnett's and Harris's parental rights to D.H.1 and D.H.2.

Affirmed.

GLOVER and ABRAMSON, JJ., agree.