SLIP OPINION

Cite as 2016 Ark. App. 581

# ARKANSAS COURT OF APPEALS

DIVISION I
**No.** CV-16-710

| | |
|---|---|
| TIMOTHY STANLEY AND JENNIFER LONG<br><br>APPELLANTS<br><br>V.<br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN<br><br>APPELLEES | **Opinion Delivered:** November 30, 2016<br><br>APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, EIGHTH DIVISION<br>[NO. 60JV-15-983]<br><br>HONORABLE WILEY A. BRANTON, JR., JUDGE<br><br>AFFIRMED |

**WAYMOND M. BROWN, Judge**

Appellants appeal from the circuit court's termination of their parental rights to T.S., born 3/4/2005, and C.S., born 9/5/2006.[1] On appeal, both appellants argue that there was insufficient evidence to support the circuit court's adoptability finding. Stanley makes the additional argument that there was insufficient evidence to support the circuit court's finding that there was potential harm in returning the children to his custody. We affirm.

I.       *Facts*

An amended petition for ex parte emergency custody and dependency-neglect due to environmental neglect and parental unfitness was filed on March 8, 2013.[2] After receiving a report on February 27, 2013, a caseworker investigated the report on the same date and

---

[1] Appellants have filed individual briefs.

[2] The original petition was filed on March 4, 2013.

found that the home had no utilities and was unclean, as had been reported. A 72-hour hold was taken on the children on the same date. The circuit court entered an order giving appellants joint custody of the children and closing the case on October 4, 2013.[3]   On July 9, 2015, a report was made alleging that appellants had unsuccessfully attempted to give away their children, threatened harm to the children, and had inadequate food. A caseworker investigated the report on the same date and found that the home was "deplorable"; had no electricity, gas or running water;[4] and had no food. Additionally, Stanley tested positive for THC, benzos, oxycodone, methamphetamine, and amphetamine. A 72-hour hold was taken on the children on the same date. On July 13, 2015, the Arkansas Department of Human Services (DHS) filed a petition for ex parte emergency custody and dependency-neglect due to parental unfitness, drug use by the parents, neglect, and environmental neglect. The circuit court entered an ex parte order for emergency custody on the same date.

The circuit court entered a probable-cause order on July 30, 2015, finding that probable cause existed for the children's removal and still existed. On September 30, 2015, it entered an order adjudicating the children dependent-neglected, by stipulation and by a preponderance of the evidence. It found therein that the children had been subjected to

---

[3] Services provided during the course of the 2013 case included worker visits, random drug screens, foster home, board payments, clothing vouchers, educational services, medical services, transportation services, visitation, drug-and-alcohol assessments, individual and family counseling, parenting classes, psychological evaluations, supervised visitation, and housing assistance.

[4] There had been no utilities in the home for over a month.

aggravated circumstances in that it was unlikely that services to the family would result in successful reunification within a reasonable time from the children's perspective. Noting that it could immediately authorize a petition for termination of appellants' parental rights, it instead ordered reunification services to be provided "partially because there was a willingness to stipulate to a finding of dependency/neglect" by appellants. It deemed appellants unfit "for a variety of reasons including ongoing drug use, environmental neglect, and inadequate housing with lack of utilities (water and electric)." Noted in the order was that appellants had tested positive for amphetamines and methamphetamine on August 13, 2015.

The circuit court entered a permanency-planning order on April 19, 2016.[5] The goal of the case was changed to termination of Stanley's parental rights as Stanley had "made an effort to comply with court orders, but no material progress [had] been made." In its findings, it specifically stated that "[w]ith the current case, history is repeating itself"; that even if Stanley had demonstrated fitness and custody was returned and the case was closed, "there is a concern that [he] would revert back to a practice of unfitness, as this is what happened after the previous case was closed"; and that "there are now two cases which share much of the same issues and concerns."

It noted that the electricity has not been on in the home since the beginning of the summer and DHS had not been able to view the inside of the home. Stanley had tested positive for methamphetamines twice,[6] both screens had been at Stanley's request, and

---

[5] A handwritten note appears on the order stating "Original Filed 2015-Dec-23 15:57:01" with the initials "SOS."

Stanley had testified that he screened positive "due to a former friend putting methamphetamine in his food when [Stanley] went over to the friend's home for dinner." Before authorizing DHS to file a petition to terminate appellant's parental rights, the circuit court stated that it was "disturbed at the parent's in-court demeanor"[7] and was really concerned about the father who was "silently agitated during the hearing" and whose testimony was "oftentimes bizarre, the result of psychosis, misrepresentation or both." Despite the authorization and a second finding of aggravated circumstances due to it being unlikely that services to the family would result in successful reunification within a reasonable time from the children's perspective, the court ordered services to continue.

DHS filed its petition to terminate appellants' parental rights on March 11, 2016, asserting that termination of appellants' parental rights was in the children's best interests.[8] Following a hearing on April 19, 2016, the circuit court entered an order terminating appellants' parental rights on May 16, 2016. With regard to potential harm, it stated that it "specifically considered the potential harm to the health and safety of the juveniles caused by returning the juveniles to the parents and found that they would be exposed to the risk of harm of environmental neglect and drug use if returned." This timely appeal followed.

---

[6] One screen could not be confirmed due to mislabeling.

[7] It did not identify which parent it was referring to in this statement.

[8] DHS also asserted two grounds for termination; however, appellants do not contest the grounds given before this court.

SLIP OPINION

II.        *Standard of Review*

We review termination-of-parental-rights cases de novo.[9] At least one statutory ground must exist, in addition to a finding that it is in the child's best interest to terminate parental rights; these must be proved by clear and convincing evidence.[10] Clear and convincing evidence is defined as the degree of proof that will produce in the fact finder a firm conviction as to the allegation sought to be established.[11] In making a "best-interest" determination, the trial court is required to consider two factors: (1) the likelihood that the child will be adopted, and (2) the potential harm to the child if custody is returned to a parent.[12] The appellate inquiry is whether the trial court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous.[13] A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire

---

[9] *Ford v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 226, at 2, 434 S.W.3d 378, 380 (citing *Dinkins v. Ark. Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001)).

[10] *Id.* (citing Ark. Code Ann. § 9-27-341 (Supp. 2013); *M.T. v. Ark. Dep't of Human Servs.*, 58 Ark. App. 302, 952 S.W.2d 177 (1997)).

[11] *Weatherspoon v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 104, at 7, 426 S.W.3d 520, 525 (citing *Ullom v. Ark. Dep't of Human Servs.*, 67 Ark. App. 77, 992 S.W.2d 813 (1999)).

[12] *Miller v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 239, at 7, 492 S.W.3d 113, 117 (citing *Smith v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 753, 431 S.W.3d 364; *Harper v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 280, 378 S.W.3d 884).

[13] *Vail v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 150, at 10, 486 S.W.3d 229, 234 (citing *J.T. v. Ark. Dep't of Human Servs.*, 329 Ark. 243, 947 S.W.2d 761 (1997)).

evidence is left with a definite and firm conviction that a mistake has been made.[14] In resolving the clearly erroneous question, we must give due regard to the opportunity of the circuit court to judge the credibility of witnesses.[15]

### III.    *Adoptability*

Neither Stanley nor Long challenge the statutory grounds for termination; rather both argue that the circuit court's best-interest finding must be reversed. Both Stanley and Long argue that there was insufficient evidence to support the circuit court's finding that there was a likelihood that the children would be adopted. While the likelihood of adoption must be considered by the circuit court, that factor is not required to be established by clear and convincing evidence.[16] A caseworker's testimony that a child is adoptable is sufficient to support an adoptability finding.[17] The trial court "must simply consider the likelihood that the children will be adopted—that factor need not, however, be established by clear and convincing evidence."[18] Our appellate courts have noted that, in considering the best

---

[14] *Id.* (citing *Yarborough v. Ark. Dep't of Human Servs.*, 96 Ark. App. 247, 240 S.W.3d 626 (2006)).

[15] *Caldwell v. Arkansas Dep't of Human Servs.*, 2016 Ark. App. 144, at 4, 484 S.W.3d 719, 722 (citing *McFarland v. Ark. Dep't of Human Servs.*, 91 Ark. App. 323, 210 S.W.3d 143 (2005)).

[16] *Caldwell v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 144, at 5, 484 S.W.3d 719, 722 (citing *Hamman v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 295, 435 S.W.3d 495).

[17] *Id.*

[18] *Renfro v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 419, at 6, 385 S.W.3d 285, 288 (quoting *Dority v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 295, at 6 (citing *Reid v. Ark. Dep't of Human Servs.*, 2011 Ark. 187, 380 S.W.3d 918)).

interest of the child, there is no requirement that every factor considered be established by clear and convincing evidence; rather, after consideration of all factors, the evidence must be clear and convincing that termination is in the best interest of the child.[19]

Long argues that the former caseworker's statement, when asked if the children were adoptable was a "bare statement" that did not "chin" the likelihood–of–adoption bar. The caseworker responded by testifying, "Absolutely because yeah, they love people. They're very personable to others." Long essentially argues that saying the children are adoptable is not the same as stating the likelihood that the children would be adopted, which is what is required by the statute.[20] Stanley argues that the former caseworker's statement regarding the children's adoptability was "merely an overly broad conclusion."[21] In support of his argument, Stanley relies on *Haynes v. Arkansas Department of Human Services*,[22] *Grant v.*

---

[19] *Id.* at 9, 385 S.W.3d at 289 (citing *Reid v. Ark. Dep't of Human Servs.*, 2011 Ark. 187, 380 S.W.3d 918; *McFarland v. Ark. Dep't of Human Servs.*, 91 Ark. App. 323, 210 S.W.3d 143 (2005)).

[20] *See* Ark. Code Ann. § 9-27-341(b)(3)(A)(i).

[21] Stanley also argues that no employee of DHS testified to the children's adoptability as their former caseworker, who testified, no longer worked for DHS, and their current caseworker did not address the likelihood of the children's adoption during his testimony. Appellant did not raise this argument below. An argument not raised and ruled on below is not preserved for this court's review. *See Burnett v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 596, at 12, 385 S.W.3d 866, 873; *Gilmore v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 614, at 9, 379 S.W.3d 501, 506.

[22] 2010 Ark. App. 28.

*Arkansas Department of Human Services*,[23] and *Kerr v. Arkansas Department of Human Services & Minor Children*.[24] As discussed below, all are distinguishable.

In its order terminating the appellants' parental rights, the circuit court stated the following:

> This Court finds by clear and convincing evidence that it is in the best interest of the juveniles to terminate parental rights. In making this finding, the court specifically considered the likelihood that the juveniles will be adopted if the termination petition is granted, specifically the testimony of Tasha Washington who stated that she thought the children were adoptable and the testimony of the foster mother who testified that the children had made great progress in foster care and the children were intelligent.

Immediately prior to being asked whether the children were adoptable, Washington testified to the following:

> I've seen changes in the kids since they've been in foster care.
>
> C.S. was failing when he first got into care. Now he has A's and B's. He said he hated school. Now he likes school. He is excited to tell people about his grades. They didn't brush their teeth. The foster parent had to tell them to. Then they got to doing it on their own and picking up after themselves. They would just drop clothes everywhere. Their academics have improved dramatically.
>
> As to any change in their emotional states, well, they've always been happy children, like the therapists said, optimistic and happy. That's pretty consistent.

It was after this testimony that Washington responded to the question of whether the children were adoptable with, "I absolutely feel these children are adoptable because yeah, they love people. They're very personable with others." Her prior testimony informed the

---

[23] 2010 Ark. App. 636, 378 S.W.3d 227.

[24] 2016 Ark. App. 271, 493 S.W.3d 342.

SLIP OPINION

latter testimony as it detailed the character and personalities of the children, which informs adoptability.

The children's foster mother testified that the children had made "great progress" since coming into her care in July 2015. T.S. had become a straight-A student and maintained those grades, though he previously "hated school" and made Ds and Fs. She further testified of both children that, in direct contrast to their behavior when they came into care,

> [t]hey now make their beds. They fold and put away their clothes. They do their laundry. They help in the kitchen. They load and unload the dishwasher. They love to do the chores and stuff and they get recognition. They are good with the other children in the home. They're great personalities. They're quite funny. They're all-around good kids.

Again, while this is not testimony directly on adoptability, this testimony informs adoptability.

Additionally, while not expressly listed in the circuit court's order, there was testimony from the children's therapist that the children "are great in counseling. They're making a lot of progress, but their issues are mild." While noting that C.S. has ADHD and both children have adjustment disorder, she went on to testify that "[t]hey are very resilient, high-functioning children. . . . They don't complain a lot. They have a very positive perspective on their situation."

The cases that Stanley cites in support of his argument of insufficient evidence of adoptability are distinguishable where no evidence or testimony regarding adoptability was

given at all,[25] there was a general statement that "all children are adoptable" with no facts specific to that case,[26] or there was only evidence of the child's desire to be adopted and nothing else.[27] In the case before this court, the former caseworker expressly testified that the children were adoptable, and multiple witnesses testified to the children's emotional capabilities and characteristics, which all inform adoptability. Given this information, this court cannot find that the circuit court erred in finding that the children were adoptable.

## IV.    *Potential Harm*[28]

Stanley argues additionally that there was insufficient evidence to support the circuit court's finding that potential harm to the children would occur if returned to his custody. He essentially argues that the circuit court relied too heavily on the children's prior removal from his custody in deciding to terminate his parental rights in this case. He argues that he was making sufficient progress in this case to keep the case open and that he posed no risk to his children.

---

[25] *Haynes*, 2010 Ark. App. 28, at 4 ("The record shows no consideration by the circuit court of adoptability as part of its best-interest analysis. Indeed, no evidence of adoptability of the children was introduced at the hearing.").

[26] *Grant*, 2010 Ark. App. 636, at 13, 378 S.W.3d at 233 ("It is clear that [child's] autism sometimes causes disruptive behavior and, we think, equally clear that this condition was not considered in determining whether he was adoptable." The caseworker's opinion that "all children are adoptable" was not sufficient where the child had mental problems requiring more treatment and therapy.).

[27] *Kerr*, 2016 Ark. App. 271, at 8, 493 S.W.3d at 347 (The only evidence regarding adoptability was the child's testimony that she wanted to be adopted.).

[28] Because Long did not make this argument, the section refers only to Stanley.

A trial court is only required to consider potential harm to a child's health and safety that might come from continued contact with the parents; there is no requirement to find that actual harm would result or to identify the potential harm.[29] Potential harm must be viewed in a forward-looking manner and in broad terms.[30] The risk for potential harm is but a factor for the court to consider in its analysis.[31]

The children were removed from Stanley in 2016 due to environmental neglect due to the home having no utilities and being unclean. In the 2013 case, as noted in the circuit court's termination order in this case, Dr. Paul DeYoub stated in his April 23, 2013 psychological evaluation that "These two individuals are inadequate parents, both of them. . . . I do not see how these two people, together or separately, will become much different than they are now. They have been under the radar for a long time with these two kids, before they were finally removed." Despite Dr. DeYoub's assessment, services were provided to Stanley, which included worker visits, random drug screens, foster home, board payments, clothing vouchers, educational services, medical services, transportation services, visitation, a drug-and-alcohol assessment, individual and family counseling, parenting classes, psychological evaluations, supervised visitation, and housing assistance. In its August

---

[29] *Hamman v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 295, at 11, 435 S.W.3d 495, 502 (citing *Pine v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 781, at 11, 379 S.W.3d 703, 709 (citing *Dowdy v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 180, 314 S.W.3d 722)).

[30] *Fox v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 666, at 7, 448 S.W.3d 735, 739 (citing *Collins v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 90).

[31] *Id.* (citing *Carroll v. Ark. Dep't of Human Servs.*, 85 Ark. App. 255, 148 S.W.3d 780 (2004)).

29, 2013 review order entered immediately prior to the order awarding joint custody and

closing the case, the circuit court stated

> Putative father has substantially complied with the case plan and court orders. Specifically, he has done all he can to comply. He still lives in the same residence with the mother. The home is clean and picked up, there is sufficient food, and the utilities and water are on and running. Father is employed by the City of Little Rock. Father's drug screens have been negative. Father has had twenty-six (26) therapy sessions and has been successfully discharged. His therapist reports he has the necessary skills to parent these juveniles, and has a positive bond with the juveniles. Father's unsupervised visits have indicated no problems with the juveniles. Father has not had couples therapy, but that is not his fault. . . . He loves the mother and helps her make good decisions for the family. They work together as a family unit.

Despite the plethora of services that were provided to Stanley in the 2013 case, which

resulted in the return of the children to his custody, the children were removed in this case

in 2015 for environmental neglect again in addition to parental unfitness, drug use, and

neglect. Dr. George DeRoeck stated in his October 5, 2015 psychological evaluation of

Stanley, which was referenced in the circuit court's order terminating Stanley's parental

rights, that "[r]eunification is indicated though I believe the overall progress is poor to

guarded, at best." The circuit court noted that it did not see a significant difference in the

two psychological evaluations, though two years apart. The evidence was that some of the

same issues were recurring in this case like a lack of utilities in the home—there was no

electricity in the home until December 2015—as well as some new issues.

Stanley is asking for additional time in this case based on the fact that he was making

progress in this case. Stanley made progress in his previous case, to the point of regaining

custody of the children, only to have the same issues—in addition to new ones—recur and

cause removal of the children again. With a few exceptions, Stanley has received every

service in this case that he received in his previous case, and yet the children ended up back

in DHS's custody. Specifically, with regard to drug use, the circuit court stated that it thought Stanley could choose to use drugs, which he could "control at will[,]" and found harm not only in the potential for environmental neglect, but also in Stanley choosing to use drugs again.[32]

Past behavior serves as a predictor of potential harm to the child if returned to the parent's custody.[33] Accordingly, as the circuit court found, history is likely to repeat itself. A parent's plea for more time is inconsistent with the statutory mandate to provide permanency in a minor child's life in circumstances in which returning the child to the family home is contrary to the minor's health, safety, or welfare, and the evidence demonstrates that a return to the home cannot be accomplished in a reasonable period of time as viewed from the minor child's perspective. A child's need for permanency and stability may override a parent's request for more time to improve the parent's circumstances.[34] Given the totality of the circumstances, we cannot find that the circuit court erred in finding that there was a potential harm to the children in being returned to Stanley.

---

[32] The circuit court stated, "Now that the Court had our kids or DHS, we're gonna put the drugs down; but, when we get them back, they no longer have the incentive to refrain from drugs. That's by choice. That's something they can control, and I believe those are the life choices that they made consistent with their emotional and psychological profiles."

[33] *McElwee v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 214, at 7, 489 S.W.3d 704, 708 (citing *Whittiker v. Ark. Dep't Human Servs.*, 2015 Ark. App. 467, at 8, 469 S.W.3d 396, 401).

[34] *Loveday v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 282, at 9, 435 S.W.3d 504, 510 (citing *Dozier v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 17, 372 S.W.3d 849).

Affirmed.

ABRAMSON and VAUGHT, JJ., agree.

*Brett D. Watson, Attorney at Law, PLLC*, by: *Brett D. Watson*, for appellant Jennifer Long.

*Tabitha McNulty*, Arkansas Public Defender Commission, for appellant Timothy Stanley.

*Andrew Firth*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor children.