PHILLIP T. WHITEAKER, Judge *176 The Pulaski County Circuit Court terminated the parental rights of appellant Latoya Thomas to her three children, A.Y.1, A.Y.2, and Z.T.[1] On appeal, Thomas challenges both the statutory grounds on which the circuit court relied for termination and the circuit court's best-interest finding. We affirm.
I. Background
Thomas became involved with the Department of Human Services (DHS) in May 2015 when the Division of Children and Family Services (DCFS) received a report that Z.T. had been subjected to medical neglect and malnourishment. As a result, DCFS opened a protective-services case in August 2015. DCFS assigned a caseworker, and Thomas was referred to a psychiatrist to assist her with getting back on her medication for bipolar disorder and schizophrenia. During the pendency of the protective-services case, Thomas exhibited combative behavior. In September 2015, Thomas took A.Y.1 to Arkansas Children's Hospital in Little Rock, where she became belligerent and verbally combative with the staff. When confronted by DCFS about the hospital incident, Thomas yelled and cursed at the caseworker, and she admitted that she was not taking her medications. DCFS further learned that Thomas had expressed suicidal ideations. The caseworker became concerned for the children's safety and attempted to exercise a seventy-two-hour hold on them.
When DCFS attempted to place the hold on the children, the caseworker found Thomas and the children at the home of Princeton Mazique, A.Y.1 and A.Y.2's father. When Mazique opened the front door, the house reeked of marijuana; in addition, the children were dirty, did not have adequate clothing, and reported that they had not eaten that day. The caseworker told Thomas that she was taking a hold on the children, and Thomas began yelling and cursing in front of the children. When the caseworker asked for the children's medications (A.Y.1 and A.Y.2 both suffer from asthma, and A.Y.2 has a seizure disorder), Thomas said she did not have it. DHS exercised a seventy-two-hour hold on the children and filed a petition for emergency custody and dependency-neglect. DHS alleged both neglect-citing the failure to properly clothe, feed, and clean the children and the failure to provide them with their medication-and parental unfitness, including Thomas's failure to take her mental-health medication and her suicidal ideations.
The circuit court acted on DHS's petition and entered an ex parte order for emergency custody, setting the matter for a probable-cause hearing. At the hearing, the parties stipulated to probable cause.[2] The court adjudicated the children dependent-neglected *177 on November 18, 2015, finding that they had been subjected to neglect and parental unfitness. The court cited Thomas's mental-health issues that had not been appropriately addressed and her positive drug screens during the protective-services case. The court also noted that A.Y.2 had a hair-shaft test that was positive for THC. The goal of the case was established as reunification. The court ordered DHS to continue to provide Thomas services, including drug screens, a drug-and-alcohol assessment, a counseling assessment, a psychological evaluation, and parenting classes.[3]
After adjudication, DHS provided services as ordered, and initially, Thomas made progress toward reunification. She completed her parenting classes, outpatient drug classes, and a psychological evaluation, and she was attending therapy through HLH Counseling. In a permanency-planning order entered in September 2016, the court noted that while Thomas was participating in services, it could "not yet determine if [she] has ... received benefit from services." The court therefore expressly advised DHS that Thomas "require[d] more attention" and directed DHS to refer her to workforce services, rehabilitation services, or job training.
Thomas continued to make progress to the extent that she and DHS filed a joint motion for weekend visitation, which the circuit court granted in a fifteen-month permanency-planning order. In addition to the unsupervised weekend visitation, the court authorized a sixty-day trial placement after four successful weekend visits. The court expressed optimism about Thomas's progress. The court cautioned, however, that although it believed reunification was imminent and that placement of the children with Thomas could be achieved by the next hearing,
Mother was made well aware of this expectation, and if there is lack of progress such that reunification is impossible at the time of the next hearing, Mother [is] put on notice that reunification may no longer be an option at that point. While Ms. Thomas will be given every opportunity to show proof of improvement and appropriateness, these children will not languish if further progress is not forthcoming.
Thomas successfully completed the four weekend visits, and the children were placed in the sixty-day trial placement. Thomas filed a motion seeking temporary custody of her children, and the circuit court entered an agreed order for temporary custody and set the matter for a review hearing on February 27.
At that review hearing, however, DHS reported concerns about Thomas. Although Thomas had demonstrated that she could parent her children, Thomas had also expressed to her caseworker "that she does not need all the services that DHS is offering." The DHS supervisor explained that Thomas had been noncompliant with some services, such as not taking A.Y.2 to his counseling sessions for his behavioral problems and failing to ensure that he took his anti-seizure medication. In its review order, the court found that Thomas was "picking and choosing her compliance" and reserved declaring a goal for the case. Although the court once more extended extra time for the case, it warned Thomas that she needed help, stating that the problem was "that as soon as the kids came to mother's home, she just quit working. She decided she does not want or need services." The court acknowledged that the children love their mother, but it *178 found that it could not "leave [the] kids in a home that is exactly the same [as it was] at the time of the hold. If mother does not want services, she needs to say so, and the kids will come back into care."
The court held another permanency-planning hearing in May 2017. The caseworker testified that Thomas was not making progress, that the children were still missing doctor's appointments, and that "DHS has been given the runaround." The court also heard testimony that A.Y.2, who was developmentally delayed, had missed nineteen days of school since January and did not have appropriate medicine at school. Based on the evidence, the court found that the case was "right back to where we started when these children first came into care." The court again reserved setting a goal for the case, but it ordered the children back into foster care, finding that Thomas was "in no better position to care for these children now than when they came into care." The court concluded that "Arkansas law allows services to continue to parents when progress is being made and reunification is imminent; [however,] the Court sees no proof of either at this time."
After this order was entered, DHS contacted Thomas on May 31 to try to bring the children back into foster care. It was unable to do so, however, because Thomas and her mother absconded with the children to an unknown location from which she did not return until July 10. After Thomas returned with the children to Arkansas, the circuit court held another permanency-planning hearing. After hearing testimony about Thomas's flight from the state, the court found that she was not a fit and proper parent, that she had made no progress on the case, and that she "played games with court orders and with DHS when things started not to go her way." The court expressly changed the goal of the case to termination of parental rights and adoption.
II. Standard of Review
DHS filed a petition for termination of Thomas's parental rights in August 2017, nearly two years after the case began. As grounds for termination, DHS alleged twelve-months failure to remedy, Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(a) (Repl. 2015); subsequent other factors, Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(a) ; and aggravated circumstances. Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)(a)(3)(A)-(B)(i) .
On appeal, we review termination-of-parental-rights cases de novo but will not reverse the circuit court's ruling unless its findings are clearly erroneous. Dade v. Ark. Dep't of Human Servs. , 2016 Ark. App. 443, 503 S.W.3d 96. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. Id. In determining whether a finding is clearly erroneous, we have noted that in matters involving the welfare of young children, we will give great weight to the circuit court's personal observations. Jackson v. Ark. Dep't of Human Servs. , 2016 Ark. App. 440, 503 S.W.3d 122.
Our case law recognizes that the termination of parental rights is an extreme *179 remedy and in derogation of the natural rights of the parents. Fox v. Ark. Dep't of Human Servs. , 2014 Ark. App. 666, 448 S.W.3d 735. In termination-of-parental-rights matters, the circuit court is required to follow a two-step process by finding first that the parent is unfit and second that termination is in the best interest of the child. T.J. v. Ark. Dep't of Human Servs. , 329 Ark. 243, 947 S.W.2d 761 (1997) ; Smith v. Ark. Dep't of Human Servs. , 2013 Ark. App. 753, 431 S.W.3d 364. The first step requires proof of one or more of the statutory grounds for termination. Ark. Code Ann. § 9-27-341(b)(3)(B). The second step requires consideration of whether the termination of parental rights is in the children's best interest. Ark. Code Ann. § 9-27-341(b)(3)(A). As a result, DHS bears a heavy burden in seeking to terminate the relationship of parent and child. Fox, supra.
III. Discussion
In her first argument on appeal, Thomas argues that termination was not appropriate because "DHS did not make meaningful and reasonable efforts to rehabilitate [her] and failed to prove [her] lack of compliance with the case plan." Notably, however, Thomas does not expressly challenge the substance of the evidence introduced against her on the statutory grounds for termination. Her argument is instead focused on the fact that her initial psychological evaluation recommended that she undergo testing to determine whether she had an intellectual disability. She contends that if DHS had assisted her with obtaining that evaluation and had determined that she had such a disability, then DHS would have been required to comply with the Americans with Disabilities Act (ADA) and tailor her services to benefit a person with intellectual disabilities. She complains that DHS did not make reasonable accommodations for her "potential disability," and she urges that the "grounds stated for termination are all affected by the lack of action by the Department to have [her] tested for intellectual disabilities." Her argument is that if DHS had tested her for intellectual disabilities and had provided her with reasonable accommodations under the ADA, she could have benefited better from the services provided to her and would not have had her parental rights terminated.
We are unable to reach the merits of Thomas's argument, however. Although Thomas developed some testimony at the termination hearing that she had not been assessed for intellectual disabilities, she never argued to the circuit court that DHS's failure in this respect should have precluded termination of her parental rights. Moreover, she did not establish her entitlement to protection pursuant to the ADA. The circuit court made no ruling on the argument Thomas now raises; therefore, it is not preserved for appellate review. See Burnett v. Ark. Dep't of Human Servs. , 2011 Ark. App. 596, at 12, 385 S.W.3d 866, 873 ; Gilmore v. Ark. Dep't of Human Servs. , 2010 Ark. App. 614, 379 S.W.3d 501.
In her second argument on appeal, Thomas asserts that termination "was not proved to be in the best interest of [the children] due to insufficient evidence." Here, she continues her argument that she should have been tested for intellectual disabilities and provided services to accommodate her special needs. She does not, however, specifically attack either the potential-harm or adoptability aspect of the circuit court's best-interest finding. When an appellant fails to make a specific argument in his or her brief regarding the factors outlined in the termination statute, this court will consider any argument *180 pertaining to those factors abandoned on appeal. See Benedict v. Ark. Dep't of Human Servs. , 96 Ark. App. 395, 409, 242 S.W.3d 305, 316 (2006). We therefore affirm on this point as well.
Affirmed.
The parental rights of Princeton Mazique, father of A.Y.1 and A.Y.2, were also terminated in the same order. Dewayne Gulledge was listed as the putative father of Z.T. on DHS's petition, but the circuit court ultimately found that no man had had significant contacts with Z.T. such that parental rights had attached, and Gulledge was dismissed by the court. Neither Mazique nor Gulledge is a party to this appeal.
The probable-cause order also reflected that Thomas had tested positive for THC.
These services had been ordered previously at the probable-cause hearing.