Cite as 2021 Ark. App. 233

# ARKANSAS COURT OF APPEALS
DIVISION I
**No.** CV-21-34

| | |
|---|---|
| EMILY SIMMONS<br><br>APPELLANT<br><br>V.<br><br>ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD<br><br>APPELLEES | **Opinion Delivered:** May 12, 2021<br><br>APPEAL FROM THE GARLAND COUNTY CIRCUIT COURT [NO. 26JV-19-58]<br><br>HONORABLE LYNN WILLIAMS, JUDGE<br><br>AFFIRMED |

## RITA W. GRUBER, Judge

Appellant Emily Simmons appeals an order of the Garland County Circuit Court terminating her parental rights to BD (DOB 05/27/16). On appeal, Simmons challenges only the circuit court's best-interest determination. We affirm.

On February 14, 2019, the Arkansas Department of Human Services (DHS) took emergency custody of BD after he was reported to be unsupervised a half mile from his home. On February 19, DHS filed a petition for dependency-neglect, alleging that Simmons continues to leave her home and BD in conditions that could be hazardous to his health and safety. The affidavit in support of the petition indicated that BD was dirty, he had head lice, and his diaper was "extremely soiled and heavy" when he was found. Simmons was located after a twenty-five-minute search of the neighborhood. According to the affidavit, Simmons admitted using methamphetamine and THC and appeared to be under the

influence when she was located. She indicated that BD had "gotten out" of the house before, and DHS had been involved previously for that issue. The affidavit provided that DHS has a history with the family, including two hotline calls for maltreatment in February and June 2018 and an unsubstantiated finding of inadequate supervision in June 2018, where it was noted that DHS had conducted home assessments, assisted with furniture and referrals for food, clothing, and alarms on the doors. A seventy-two-hour hold was placed on BD, and an ex parte order for emergency custody was granted on February 19.

The circuit court entered an order on February 28, finding probable cause that the emergency conditions that necessitated removal of BD from Simmons's custody continued such that continuation of custody in DHS was necessary. The order noted that Simmons "waived" probable cause.[1] In a March 29 order, the circuit court adjudicated BD dependent-neglected based on neglect and parental unfitness. The circuit court found that BD suffered from neglect due to his being left alone at an inappropriate age and creating a dangerous situation that that put him at risk for harm. Specifically, BD was found to be alone and unsupervised outdoors about a half mile from his home and very dirty and with head lice. Simmons admitted methamphetamine and THC use. The circuit court ordered BD to remain in the custody of DHS because Simmons was unfit, it was in the best interest of BD, and it was necessary for the protection of his health and safety. The goal of the case was reunification with a concurrent goal of "permanent guardianship/permanent custodial placement/adoption."

---

[1]We note that the proper terminology pursuant to Arkansas Code Annotated section 9-27-315 (Repl. 2020) is that a defendant may "stipulate" that probable cause exists.

In addition, DHS was given discretion to arrange appropriate visitation. Simmons was ordered to follow court orders and the case plan; view *The Clock is Ticking*; cooperate and stay in monthly contact with the caseworker and any appointed CASA volunteer; demonstrate the ability to properly care for BD and provide for his health, safety, and welfare; remain clean and sober; submit to random drug screens; submit to a drug-and-alcohol assessment and follow all recommendations; complete parenting classes and provide proof to the caseworker; submit to individual counseling; submit to a psychological evaluation and follow all recommendations; obtain and maintain stable employment for a period of six months and provide proof to the caseworker; obtain and maintain stable housing for a period of six months and provide proof of residency to the caseworker; and notify the caseworker forty-eight hours in advance of need for transportation assistance. A review hearing was set for June 26.

Following the review hearing, the circuit court entered an order on June 28 finding that BD shall remain in the custody of DHS because his return to Simmons was contrary to his best interest. The order provided that the safety concerns that prevented trial placement or return of custody to Simmons included her use of illegal substances and inability to properly supervise BD. Reunification remained the goal of the case with a concurrent plan of "legal adoption/legal guardianship/permanent custody." The circuit court found that DHS had complied with the case plan and orders and had provided the following services to achieve the goal of reunification: foster care, medical and dental care, counseling, parenting classes, drug-and-alcohol assessment, drug-and-alcohol treatment, random drug testing, visitation, psychological evaluation, and case management. The circuit court found

DHS had made reasonable efforts to provide family services and finalize a permanency plan for BD. In addition, the circuit court found that Simmons had partially complied with the case plan and court orders, made some progress toward alleviating or mitigating the causes of the out-of-home placement; and demonstrated some progress toward the goal of the case plan. The court further found that Simmons had benefited from some of the services to remedy the issues that prevent a safe return of BD to her. However, the order noted that Simmons tested positive for amphetamines and methamphetamine on June 17, 2019, and the court was waiting on lab confirmation on the positive drug screen. She was ordered to follow the court orders and the case plan, including that she demonstrate the ability and stability to provide for the health, safety, and welfare of BD; address her addiction issue; and remain clean and sober.

The September 27 review order provided that the goal of the case remained reunification with the concurrent plan of "legal adoption/legal guardianship/permanent custody." The circuit court found that DHS had complied with the case plan but found that that Simmons had not complied. The order states that during the review period, Simmons had not complied with the case plan or court orders; had not made progress toward alleviating or mitigating the causes of the out-of-home placement; had not demonstrated progress toward the goal of the case plan; and had not benefited from the services offered to remedy the issues that prevent a safe return of BD to her. The order indicated that Simmons had not had contact with either BD or the department since July 2, 2019. She was ordered to follow the case plan and court orders.

A permanency-planning order was entered January 31, 2020, changing the goal of the case to adoption with DHS filing a petition for termination. The court found that DHS had complied with the case plan and had made reasonable efforts to provide services and finalize a permanency plan for BD but found that Simmons had not complied with the case plan or court orders. The order provided that Simmons had not completed any of the services; had not finished the parenting course or the psychological evaluation; had not visited BD since August 5, 2019; had tested positive for illegal substances on her most recent drug screens; and remained incarcerated out of state. The court ordered her to comply with the case plan.

DHS filed a termination petition on March 9, alleging numerous grounds for termination including failure to remedy (Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(a)); failure to provide significant support (Ark. Code Ann. § 9-27-341(b)(3)(B)(ii)(a)); failure to maintain meaningful contact (Ark. Code Ann. § 9-27-341(b)(3)(B)(ii)(a)); abandonment (Ark. Code Ann. § 9-27-341(b)(3)(B)(iv)); subsequent factors (Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)); and aggravated circumstances (Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)(a)(3)(a)). DHS also alleged that termination was in the best interest of BD.

A termination hearing was scheduled for April 2020, but the circuit court continued the case due to the COVID-19 pandemic. The termination hearing eventually took place October 28. Carson Taylor, the DHS caseworker assigned to Simmons, testified that DHS provided a psychological evaluation, a drug assessment, counseling, visitation, and drug screens. She stated that Simmons participated in the psychological evaluation and drug assessment but had inconsistent visitation and had not maintained stable housing throughout

5

the case. Taylor testified that a few weeks before the termination hearing, Simmons informed her that she was staying with a grandmother, but Taylor stated it is not Simmons's grandmother but a lady Simmons is taking care of in order to live where she is staying. Taylor said that Simmons's name did not appear on the lease. Taylor also said there were "long stretches" during which she did not have contact with Simmons because she was incarcerated for about six months in Texarkana. Simmons claimed that she participated in services while incarcerated but was not able to provide documentation of completion. While Simmons was unable to visit with BD while incarcerated, there were other times when she did not call or show up for visitation. Taylor stated that Simmons participated in the drug assessment but did not complete the recommended outpatient treatment. As for Simmons's employment, Taylor testified that she worked "on and off" with a temporary agency job but that her employment was not stable. Taylor thought DHS provided as much as they could to help Simmons get on her feet and stated that DHS asked for a continuance of the April 2020 termination hearing to give Simmons more time to become stable.

Taylor said that Simmons did better after her incarceration and was sober but indicated that sobriety had been a problem. She testified that DHS assisted her with information on housing but did not provide financial assistance because DHS requires a budget to show that Simmons could maintain an apartment should DHS help her acquire one. Taylor stated that Simmons never provided a budget and lost her job at the temporary agency.

The next witness to testify was Brock Baker, a foster-care supervisor with the Garland County Division of Children and Family Services. Baker had been involved at the beginning

of the case as the "removing worker." Baker prepared a court report that was introduced into evidence. He elaborated that when DHS provides rental assistance, the agency wants to know that the parents are going to be able to continue to provide their own stable housing after DHS is no longer involved. Baker stated that with Simmons they were never to a place where she was going to be stable. He said they could have paid deposits and the initial rent for her but that there was never a time that Simmons had a stable job to maintain housing. Baker recognized that Simmons claimed she was earning $400 a month but stated that the "situation" could become unstable if the woman she lived with became ill or chose to end the arrangement. Baker said that DHS provided Simmons with "furloughs for housing" but did not pay for the "initial housing."

Baker testified that since the previous hearing, Simmons had three or four visits with BD that went well. He indicated that she knows how to parent her son but was concerned that BD had been in foster care for eighteen months, which was a "great majority" of his life. Baker testified that that Simmons had not been able to provide a stable place for BD to live. The court report provided that Simmons had attended twenty-four visits during the eighteen months and had failed to show eighteen times, but Baker said visitation had improved since the last hearing. Baker identified the potential harm that DHS was concerned about as the possibility of sending BD on a trial home visit in a housing situation that might fall apart tomorrow, and Simmons had not been consistent in her ability to care for BD. He applauded Simmons's ability to remain sober but remained concerned about her ability to provide for BD's in the most basic forms that he needed to survive. In regard

to potential adoption, Baker testified that BD is highly adoptable and that there were 358 matches for potential adoptive families.

Simmons testified that after the last hearing, she was given more time to obtain housing and had obtained a place in August where she resided at the time of the hearing. She said that Taylor visited her home, thought it was "wonderful," and "okayed it." Considering how everything was going, she thought BD would be returned to her because the only thing lacking was housing. She stated that her cousin's husband's grandmother wanted to move in with her to help her get BD back and was paying her $400 a month. She claimed she had maintained a job and a home for three or four months at the time of the termination hearing. She testified that she had $100 remaining at the end of the month after paying for gas and groceries and that she had applied for food stamps. Simmons said that her name was the only one on the lease. In regard to missing visitation, she said she had gone to visitation with a cough and runny nose and was sent home. She pleaded to the court to not grant the termination because she had done all that was asked of her emphasizing that the last time she was in court, all she needed was to find a house and a job.

On cross-examination, Simmons testified that BD had only been three or four houses away on the day he was removed from her home. She also indicated that she has $200 remaining at the end of the month after she pays for the water bill, gas, and groceries and has saved $600 thus far. She was not sure if she had provided the lease to her caseworker.

At the conclusion of the hearing, the circuit court stated that the case came down to two issues—the ability to support BD and the ability to provide him stable housing. The court found that, despite the extra time Simmons had been given, she was not able to make

progress. The circuit court found some of Simmons's testimony credible but found her testimony not credible in regard to housing and employment. The circuit court entered an order on October 28 terminating Simmons's parental rights to BD finding that DHS had proved four grounds for termination (failure to remedy, failure to provide significant meaningful support, subsequent factors, and aggravated circumstances) and that termination was in BD's best interest. Simmons timely appealed the termination order.

This court's review of cases involving the termination of parental rights is de novo. *Brown v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 370, at 7, 584 S.W.3d 276, 280. Grounds for termination must be proved by clear and convincing evidence, which is such a degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Id.* Our inquiry is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *Id.* Credibility determinations are left to the fact-finder. *Id.*

Termination of parental rights is a two-step process requiring a determination that the parent is unfit and that termination is in the best interest of the child. *Id.*, 584 S.W.3d at 280. The first step requires proof of one or more statutory grounds for termination. Simmons does not challenge the statutory grounds found for termination. The second step, the best-interest analysis, includes consideration of the likelihood the juvenile will be adopted and of the potential harm caused by returning custody of the child to the parent. *Id.*, 584 S.W.3d at 280–81. In determining potential harm, which is forward looking, the court may consider past behavior as a predictor of likely potential harm should the child be returned to the parent's care and custody. *Id.* There is no requirement to establish every

9

factor by clear and convincing evidence; after consideration of all factors, the evidence must be clear and convincing that termination is in the best interest of the child. *Id.*

On appeal, Simmons challenges only the circuit court's best-interest determination. She does not challenge the circuit court's adoptability finding but instead contends that the circuit court's potential-harm finding is not supported by sufficient evidence. She argues that that she had a home and a job, and it was erroneous and purely speculative for the circuit court to base termination on what could occur in the future with her home and income. She also contends that poverty is not the type of harm intended to support termination and that the potential harm, which she identifies as "the risk of insufficient resources," cannot be based purely on speculation.

Simmons cites *Bunch v. Arkansas Department of Human Services*, 2017 Ark. App. 374, at 9, 523 S.W.3d 913, 918, in support of her argument, but her reliance on *Bunch* is misplaced. Although this court stated that the appellant's lack of financial means was not a sufficient basis to terminate her parental rights, the reversal was based on the fact that the children had been in a placement with their grandmother since shortly after their removal. In *Bunch*, we held that there was no urgency for permanency and stability because, whether or not termination occurred, the children would remain with their grandmother who had expressed a desire to adopt the children if appellant's rights were terminated. Considering the bond between the appellant and her children, we concluded that there was little harm in affording the appellant more time toward reunification and held that the circuit court clearly erred in finding that termination was in the children's best interest.

We have stated that a parent's lack of stable housing or employment can demonstrate potential harm to a child, as can a parent's continued illegal-drug usage. *See, e.g.*, *Gonzalez v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 425, at 12–13, 555 S.W.3d 915, 921–22 (affirming the circuit court's potential-harm finding based on appellant's consistent lack of stability in regard to housing and employment and failure to comply with court orders to obtain and maintain both); *Jung v. Ark. Dep't of Hum. Servs.*, 2014 Ark. App. 523, 443 S.W.3d 555 (holding that, while there was some evidence that Jung was recently employed and sober at the time of the hearing, there was insufficient proof that, given her history, she could maintain employment or sobriety).

Here, the circuit court found that Simmons's lack of stability was indicative of potential harm. We agree. We have noted that a court may consider past behavior as a predictor of likely potential harm should the child be returned to the parent's care and custody. *See Gonzales*, *supra*. We have also held that a parent's failure to comply  with court orders itself is sufficient evidence of potential harm. *Id*.

The intent behind the termination-of-parental-rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home cannot be accomplished in a reasonable period of time as viewed from the child's perspective. Ark. Code Ann. § 9-27-341(a)(3). Simmons's lack of stable employment and housing persisted throughout the entire twenty months of this case. There was testimony that Simmons had "on and off employment" with a temporary agency but that her employment was not stable. She was also unable to work for some months due to her

incarceration. In April 2020, she was given six more months to achieve stability. Although Simmons testified that her employment and housing had been stable for three or four months at the time of the termination hearing, the circuit court found her testimony not credible as to those issues. Even if the circuit court had credited Simmons's claim of recent stability, we note that this court has repeatedly held that the children's "need for permanency and stability will override [a parent's] eleventh-hour efforts." *Gonzalez*, 2018 Ark. App. 425, at 11, 555 S.W.3d at 921 (citations omitted). Given our deference to the circuit court's credibility determinations, we conclude that the circuit court's potential-harm finding is not clearly erroneous.

Affirmed.

HARRISON, C.J., and ABRAMSON, J., agree.

*Leah Lanford*, Arkansas Commission for Parent Counsel, for appellant.

*Ellen K. Howard*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor child.